555 So.2d 534 (1989)
Marcia SHROYER, as provisional tutrix of the minor child, Trina L. Joy
v.
Guy T. GRUSH, et al.
Rick Wayne JOY, individually and in his capacity as natural tutor of his minor child, Trina L. Joy
v.
Guy T. GRUSH, et al.
Nos. 88-CA-2339, 88-CA-2340.
Court of Appeal of Louisiana, Fourth Circuit.
December 14, 1989.
Writs Denied February 23, 1990.
*536 McCann & McCann, James A. McCann, New Orleans, and Charles J. Ferrara, Metairie, for plaintiffs/appellants.
Timothy G. Schafer, Schafer & Schafer, New Orleans, for defendants-appellants.
Before BARRY, BYRNES, LOBRANO, PLOTKIN and BECKER, JJ.
PLOTKIN, Judge.
Defendants/appellants Guy T. Grush and United Service Automobile Asso. appeal a judgment entered on a jury verdict, awarding $710,000 to plaintiff Marcia Shroyer, as provisional tutrix of the minor, Trina L. Joy, and $45,000 to plaintiff Rick Wayne Joy. Alternatively, the plaintiffs challenge the jury's awarding damages for loss of life, pre-death injury and pain and suffering, and wrongful death. The plaintiffs cross-appealed, challenging the trial court's granting of a motion for directed verdict in favor of Dr. Louis Grush, the defendant's father. After careful review of the entire record, as well as extensive research of pedestrian-motorist cases in Louisiana and around the country, we reverse on the liability issue and pretermit discussion of the damages and directed verdict issues.
I. FACTS
Lyndell Redmond Joy, mother of Trina L. Joy and wife of Rick Wayne Joy, was killed July 13, 1980 between 9:45 and 10 p.m. when she was struck by a vehicle driven by defendant Grush while she was walking across Interstate 10 (I-10) east of New Orleans. Grush was traveling in the far right lane of traffic, going from his girlfriend's apartment in New Orleans East to his apartment in Slidell, when the accident occurred. He testified at trial that he was driving a 1976 Plymouth, which he had recently purchased in Florida, through a dark section of the roadway near Exit 248. There were no streetlights or other illumination in the area. At the point where the accident occurred, eastbound I-10 consists of three regular lanes of traffic plus an entrance lane.
When Grush encountered Mrs. Joy, she was walking from the right side of the road into the lane of moving traffic. Grush stated that he slammed on his brakes and swerved his car to the left, but that he was unable to avoid hitting the pedestrian. Grush testified that Mrs. Joy threw up her hands just before the car struck her body, which was flung into the hood and over the top of the car. When he came to a stop, his car had spun around and was facing the body, which was lying in the center lane. Stating that he thought she was dead, Grush admitted that he panicked and left the scene. He voluntarily turned himself in at the Slidell Police Department about an hour later.
The evidence presented at trial established that the victim's body had been overrun by a number of vehicles before the *537 police arrived on the scene to control traffic. Both Roberta Wood Hughes and Slidell Police Department Chief of Detectives Eugene Swann stated that they were unable to see the body until it was right in front of their car. Both of them pulled over to the side of the road and stated that they saw a number of other people hit the decedent. Detective Swann testified that he tried to reach the body several times and was almost run over himself a couple of times.
Three pathologists testified at trial concerning the cause of death. Dr. Richard Tracy, who actually performed the autopsy, stated that Mrs. Joy did not survive the initial impact. Dr. Tracy stated that Mrs. Joy died of "multiple major injuries," with the worst injuries being to the pelvis. He said that there were no tire tracks on the body. Dr. Paul McGarry, who reviewed the autopsy report, agreed with Dr. Tracy's conclusion that the initial injury had caused the death. He was more specific than Dr. Tracy concerning cause of death, saying that the initial impact was so violent that it actually cut the brain stem. Dr. Monroe Samuels, a consulting pathologist in the coroner's office, also reviewed the autopsy report. He agreed that the initial impact caused the accident.
Prior to the accident, defendant Grush had spent the afternoon with his girlfriend, then had returned to the apartment that his girlfriend shared with a friend, Amy Shearman. Shearman's mother was present at the apartment and had cooked dinner. Grush testified that he had eaten a plate of red beans and rice and drank two or three "Miller Pony" (seven-ounce) beers before starting home. Both Shearman and her mother testified that Grush was "himself" and that he was acting "normally" when he left the apartment.
The evidence presented at trial indicated that the victim, Mrs. Joy, had last been seen by her sister, Billie Redmond Hawk, and her sister's boyfriend, Charles Taylor, outside Lou's Bar in Bridge City about an hour prior to the accident. She had been sitting in a car with two unidentified men, one of whom was named "Ron." Ms. Hawk and Taylor testified by depositions presented at trial that they tried to convince Mrs. Joy to go home and take care of her daughter, but that she declined, saying she would be home in a little while. Taylor stated that Mrs. Joy was "high." The police report on the incident indicated that Mrs. Hawk stated that her sister held out her arms and said that "someone had shot her up," presumably referring to a drug injection. Ms. Hawk and Taylor saw the car leave Lou's Bar and pull in at Dee's Bar down the street. Although the plaintiffs assert a number of different theories on the subject, no direct evidence concerning how the victim got from Bridge City to the interstate in New Orleans East was presented at trial.
II. STANDARD OF REVIEW
The Louisiana Constitution provides that in civil cases, "appellate jurisdiction of a court of appeal extends to law and facts." La. Const. art. 5, sec. 10. The Supreme Court has limited appellate review of factual findings made by a trial court, stating in Canter v. Koehring, 283 So.2d 716 (La. 1973), as follows:
When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, on review the appellate court should not disturb this factual finding in the absence of manifest error.
Id. at 724.
The "manifest error" standard established in Canter, supra, was further explained in Arceneaux v. Dominque, 365 So.2d 1330 (La.1978), as follows:
[A]ppellate review of facts is not completed by reading so much of the record as will reveal a reasonable factual basis for the finding in the trial court; there must be a further determination that the record establishes that the finding is not clearly wrong.
Id. at 1333.
Most recently, in Rosell v. ESCO, 549 So.2d 840 (La.1989), the Louisiana Supreme Court reaffirmed its position that trial court judgments based purely on the factfinder's *538 choice of two possible versions of the facts should not be reversed, then stated as follows:
The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong.... In applying the manifestly erroneous-clearly wrong standard to the findings, below, appellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo.

Id. at 844. (Emphasis added.) The court went on to explain in a footnote that the appellate court is required to redetermine the facts de novo once it has determined that the trial court committed a reversible error of law or manifest error of material fact. Additionally, despite the Rosell opinion's emphasis on acceptance of the trial court's evaluations of credibility, the Supreme Court allowed that even decisions based on the acceptance of one witness' story over another may properly be reversed when objective evidence contradicts the witness' story. Id. at 844-45. (Emphasis added.)
The logical conclusion to be drawn from the above discussion is that an appellate court may properly affirm a trial court's judgment only after carefully reviewing the record and making an affirmative finding that the trial judgment is not clearly wrong or manifestly erroneous. On the other hand, when an appellate court finds that the trial judgment is clearly wrong or manifestly erroneous, it must reverse the lower court's judgment and it must perform a de novo review of the record in the case. The United States Supreme Court has stated that a finding is clearly wrong or manifestly erroneous under the following circumstances: "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." McAllister v. United States, 348 U.S. 19, 20, 75 S.Ct. 6, 8, 99 L.Ed. 20 (1954).
In the instant case, we have carefully reviewed the entire record. Although there is arguably a "reasonable factual basis" to support the jury's conclusion that Grush was negligent on the night in question, the judgment awarding plaintiffs recovery against Grush is nonetheless "clearly wrong" because the plaintiff failed to establish that Grush's alleged negligence was the legal cause of the accident. Following our review of the record, we were left with the "definite and firm conviction that a mistake has been committed." McAllister, supra. On the basis of this conclusion, this court must reverse the jury's finding and dismiss plaintiffs' case.
III. PLAINTIFF'S CONTRIBUTORY NEGLIGENCE
The accident which is the subject of the instant case occurred on July 13, 1980. La. C.C. art. 2323, which provides that comparative negligence should be applied to all claims for damages, became effective on August 1, 1980. Therefore, comparative negligence principles do not apply. Prior to the adoption of La.C.C. art. 2323, claims for damages were generally subject to the contributory negligence doctrine, which barred plaintiff's recovery entirely if any negligence on the part of the plaintiff contributed to the injury.
However, the Louisiana Supreme Court held in Baumgartner v. State Farm Mutual Automobile Ins. Co., 356 So.2d 400 (La. 1978) that, in a motorist/pedestrian case where the pedestrian is injured, the defendant could no longer plead the plaintiff's contributory negligence as a defense to bar recovery. In the Baumgartner case, the plaintiffs' decedent was killed when he was struck by the defendant motorist while attempting to cross a city street in a designated crosswalk. The Supreme Court agreed with the trial court's conclusion *539 that the decedent had been negligent and that that negligence had contributed to the accident. Id. at 403. However, the court said, the defendant could have avoided the accident by acting reasonably under the circumstances. Id. at 406.
The Baumgartner case is distinguishable from the case at hand. First, the driver in Baumgartner testified that he first saw the pedestrian as he was traversing the right-hand lane, yet he failed to take any action to avoid striking him. Additionally, the pedestrian in Baumgartner was crossing a street at a designated crosswalk, whereas the plaintiff in the instant case was walking across an interstate highway where pedestrians are prohibited. See LSA-R.S. 32:213 and discussion following. The Baumgartner court obviously considered this fact important because it cited a number of cases holding that Louisiana law "imposes an additional burden upon motorists approaching a pedestrian cross walk to use more than ordinary care to see what is ahead; they must expect that people may be crossing and be prepared for that possibility." Id. at 404. Additionally, the court cited Mequest v. Algier Mfg. Co., 147 La. 364, 84 So. 904 (1920), which specifically stated that pedestrians crossing highways at points other than designated crosswalks "do so in large measure at their peril." Id. at 367, 84 So. at 905. Therefore, the Baumgartner decision is based, in large part, on the court's belief that drivers should exercise special care to avoid injuring persons crossing streets at locations where they have reason to anticipate pedestrians on the roadway. In such cases, "the motorist, as against the pedestrian, bears the greater burden of careful lookout and extreme caution at locations provided for the passage of pedestrians." Baumgartner, 356 So.2d at 404. (Emphasis added.) Certainly the Baumgartner case was not intended to impose an extra duty on motorists driving on interstate highways to anticipate the presence of pedestrians walking in locations where they are prohibited by law.
In fact, Baumgartner specifically noted that "a motorist who exercises all reasonable care to protect a pedestrian, who nonetheless suffers injury, is not at fault." Id. at 406. Motorists are considered responsible for injuries to a pedestrian, despite the existence of contributory negligence on the part of the pedestrian, only when "the operator could reasonably have avoided the accident." Id. at 405, citing Guilbeau v. Liberty Mutual Ins. Co., 338 So.2d 600 (La.1976). The court also cited a number of cases in which the pedestrian-plaintiff had been denied recovery, distinguishing those cases from Baumgartner, saying that in all of the former cases "the motorist was not negligent since he discovered the pedestrian as soon as it was possible for him to do so, and did all in his power to avoid the collision." Id. at 407. Therefore, Baumgartner "does not impose absolute liability on the driver of an automobile simply because there was a collision between a car and a person, nor is a motorist liable irrespective of fault on his part." Bourgeois v. Jones, 481 So.2d 145, 149 (La.App. 5th Cir.1985), writ denied 484 So.2d 136 (La.1986).
We hold that the Baumgartner decision was never intended to protect a pedestrian who was grossly negligent in walking on an interstate highway where he is prohibited from walking, such as the plaintiffs' decedent in the instant case. Therefore, even if the trial court had correctly held that the defendant's negligence was a legal cause of the accident, the plaintiffs would be barred from recovery by the decedent's gross contributory negligence. However, such a finding is not necessary since our review of the record convinces us that the plaintiffs failed to establish any negligence on the part of the defendant which caused the accident. See discussion following.
IV. DUTY/RISK ANALYSIS
The Louisiana Supreme Court has recently reaffirmed the application of the duty/risk analysis to negligence cases in this state. See Pitre v. Opelousas General Hospital, 530 So.2d 1151 (La.1988). The concept was redefined in the Pitre case and the court established the following "elements of delictual responsibility":

*540 1. Given the relationship and circumstances of the parties, does the law impose upon the defendant a duty of reasonable conduct for the benefit of the plaintiff, the violation of which is considered to be fault?
2. If the defendant owed such a duty, did his conduct fall short of the standard and come within the scope set by law?
3. Did the defendant's negligence in fact cause damage to the plaintiff (`cause in fact')?
4. Should any of the damage to the plaintiff be ascribed in law to the defendant, and, if so, should the defendant be held liable for every kind of damage done to each of plaintiff's interests (`legal cause')?
Id. at 1155. In Pitre, the Supreme Court stated that affirmative answers must be given to all of the above questions before a defendant can be held liable for a plaintiff's injuries. Id.
In Pitre, supra, the court assumed the existence of both cause in fact (element 3) and negligence (breach of dutyelement 2) and focused its discussion on legal causation and duty as they relate to foreseeability of damages. The problems in the instant case are different. Our analysis of the facts and circumstances surrounding the accident at issue here will focus on the general and specific duties owed by defendant to the plaintiffs' decedent, as well as whether the defendant breached any of those duties. We will also discuss whether the defendant is entitled to claim the benefits of the inevitable accident and sudden emergency doctrines. Therefore, we will rely both upon the Supreme Court statement concerning duty/risk as discussed in Pitre and the traditional duty/risk analysis as discussed in W. Crowe, "The Anatomy of a TortGreenian, As Interpreted By Crowe Who Has Been Influenced By MaloneA Primer," 22 Loy.L.Rev. 903 (1976).
A. General Duties
Certainly, Louisiana law does impose duties of reasonable conduct on a defendant motorist for the benefit of a pedestrian plaintiff. Additionally, the violation of any of those duties is considered to be negligence or "fault," as required by the Pitre analysis. Many of those duties are statutory. See LSA-R.S. 32:1 et seq. Others have been developed jurisprudentially.
In Louisiana, pedestrians are subject to the following statutes:
A. Every pedestrian crossing a roadway at any point other than within a marked cross walk or within an unmarked cross walk at an intersection shall yield the right of way to all vehicles upon the roadway.
LSA-R.S. 32:213.
(C) The use of any Louisiana Interstate Highway by pedestrians, bicycles, or other non-motorized vehicles is prohibited.
LSA-R.S. 32:263(C).
The duty of motorists specifically in regard to pedestrians is found in LSA-R.S. 32:214, which provides as follows:
Notwithstanding the foregoing provisions of this Part, every driver of a vehicle shall exercise due care to avoid colliding with any pedestrian upon any roadway and shall give warning by sounding the horn when necessary and shall exercise proper precaution upon observing any child or any confused or incapacitated person upon a highway.
Louisiana courts have interpreted LSA-R.S. 32:314, above, to require that operators of motor vehicles keep a vigilant lookout and see all things which they would have seen by exercising reasonable care; therefore, motorists are held to have seen objects which they should have seen by the use of ordinary care and prudence. Craker v. Allstate Ins. Co., 259 La. 578, 250 So.2d 746 (1971). However, the motorist has a right to assume that the road is safe for travel and has no duty to guard against unusual or unexpected obstacles or obstructions which he not only has no reason to anticipate, but which are also difficult to discover. Id. This rule has been held to apply especially to a motorist driving at night in Bordelon v. State, Dept. of Highways, 253 So.2d 677 (La.App. 1st Cir.), writ ref'd 260 La. 18, 254 So.2d 619 (1971), which stated that "a motorist driving on a *541 high speed highway at night is not as a matter of law required to see an unlighted and unexpected object in his path in time to come to a safe stop." Id. at 678. Louisiana courts have also stated that, even under the Baumgartner rule, motorists have no duty to anticipate the presence of a pedestrian in a roadway where there is no crosswalk. Osby v. Harris, 375 So.2d 181, 183 (La.App. 2d Cir.1979).
The above discussion indicates that the answer to the first inquiry in the duty/risk analysis established in Pitre, supra is "yes"Given the relationship and circumstances of the parties, the law does impose upon the defendant in this case a duty of reasonable conduct for the benefit of the plaintiff, the violation of which is considered to be fault. Therefore, we must now consider the second inquiry in the Pitre analysis.
B. Specific Duties and Defendant's Alleged Violation of Those Duties
The second question in the duty/risk analysis, which must be answered in the affirmative before a defendant may be held liable for injury to a plaintiff is the following: "If the defendant owed such a duty, did his conduct fall short of the standard and come within the scope set by law?" In considering whether the defendant motorist in the instant case violated any of the general duties set out above, we will also discuss the more specific duties which the plaintiffs claim the defendant breached.
In brief and oral argument, plaintiffs allege that the accident, and Mrs. Joy's resultant death, were caused by one or more of the following alleged negligent acts of Grush, each of which, the plaintiffs claim, violated a duty to Mrs. Joy:
1. Driving under an "impairment" caused by alcohol consumption.
2. Swerving to the left when he saw the decedent.
3. Driving with defective brakes.
4. Driving with only one headlight.
5. Driving with his lights on low beam.
6. Driving at too high a rate of speed.
7. Leaving the scene of the accident.

1. Impairment Caused by Alcohol Consumption
Under Louisiana law, it is a crime to drive while intoxicated. LSA-R.S. 14:98. We have no trouble finding that a motorist has a duty to refrain from operating a vehicle when he has consumed a sufficient amount of alcohol to affect his ability to operate the vehicle safely.
Grush admitted at trial that he drank two, possibly three, seven-ounce beers between 7 and 9 p.m. the night of the accident. New Orleans Police Officer August Santosusso, who investigated the accident, stated that he smelled alcohol when he first arrived at the Slidell police station to escort the defendant to New Orleans. However, both defendant's father, who first saw him at the police station, and his brother, who saw him before he went to the police station, stated that they had not smelled alcohol.
A breath alcohol test administered at about midnight indicated that Grush had a blood alcohol level of 0.04 per cent. The plaintiff's expert pathologist, Dr. Samuels, testified that if Grush drank his last beer at 9 p.m., his blood alcohol level was probably 0.07 per cent at 10 p.m., the approximate time of the accident. Dr. Samuels also opined that someone with a blood alcohol level of 0.07 per cent would experience some "impairment," but he failed to state whether or how that alleged "impairment" would affect the defendant's ability to properly operate a motor vehicle. On cross-examination, Dr. Samuels specifically stated that a blood alcohol level between 0.05 and 0.10 per cent is in the "low" range.
Without making any allowances for food consumption, Dr. Samuels calculated that a person who had drunk his last beer at 9 p.m. would have had an estimated blood alcohol level of 0.07 per cent at 10 p.m. He stated that consumption of food simultaneous with the consumption of alcoholic beverages slows the absorption rate of the alcohol and would result in a lower blood alcohol level at the time of the accident. *542 The defendant stated that he had a plate of beans and rice around the time he drank the beers. This testimony was confirmed by both Amy Shearman and her mother.
Plaintiffs claim that the evidence indicates that Grush had a lot more to drink on the night of the accident than he admitted. However, they offered no expert testimony or other evidence to prove that allegation. Additionally, as indicated above, the record contains the testimony of several of the people who spent the evening with Grush, all of whom supported his story.
Louisiana law contains no statutory presumption of intoxication in civil matters. Lemire v. New Orleans Public Service Inc., 538 So.2d 1151, 1154 (La.App. 4th Cir.), writ denied 542 So.2d 1383 and 543 So.2d 2 (La.1989); Whittington v. American Oil Co., 508 So.2d 180, 186 (La.App. 4th Cir.), writ denied 512 So.2d 436 (La. 1987). This court held in Whittington that neither evidence of a specific blood alcohol content nor evidence that a person consumed alcoholic beverages prior to operating a motor vehicle is sufficient to establish negligence in a civil matter. Id., 508 So.2d at 186-87. The Whittington case involved an allegation that a plaintiff had been contributorily negligent in causing an automobile accident. The court rejected that argument because the defendants failed to prove the effect alcohol had upon the plaintiff, and because the defendants failed to prove a causal relationship between plaintiff's alcohol consumption and the accident.
In order to prove negligence on the part of a person who has consumed alcoholic beverages prior to operating an automobile, there must be a showing that the person's mental and physical faculties were materially impaired at the time of the accident. Jones v. Continental Casualty Co. of Chicago, Ill., 246 La. 921, 169 So.2d 50, 52 (1964); Ryan v. State, 477 So.2d 110, 114 (La.App. 1st Cir.), writ denied 478 So.2d 136 (La.1985). In the instant case, the plaintiffs failed to meet their burden of proving the effect of alcohol consumption on Grush. In fact, the defendant offered uncontradicted proof that his alcohol consumption did not affect his ability to drive, in the form of the testimony of four people who saw him on the evening in question. Therefore, the plaintiffs failed to establish a violation of any duty based on impairment caused by consumption of alcoholic beverages.
2. Swerving to the Left
Certainly, there is no legal duty to refrain from swerving one's vehicle to the left. However, motorists do have a duty to act reasonably under the circumstances to avoid injuring pedestrians. LSA-R.S. 32:214. Plaintiffs allege that the defendant's action of swerving his automobile to the left after becoming aware of decedent's presence on the roadway was not reasonable under the circumstances, and therefore was a violation of his duty to Mrs. Joy.
Plaintiffs claim that Grush's testimony, combined with the skid mark data presented at trial, proves that he would not have struck the decedent had he not swerved his car to the left. At trial, Grush testified that he was traveling in the center lane of the interstate when she saw Mrs. Joy enter the center lane in front of him. He stated that he slammed on his brakes and turned the wheel to the left in an attempt to avoid the accident.
Two sets of skid mark data were taken by police at the scene of the accident. Officer Santosusso testified that one set was taken on the night of the accident between 12 midnight and 2 a.m., while the other was taken during the day. Although there are some inconsistencies in the two measurements, both sets of skid mark data collected by police at the scene reveal that Grush was actually traveling in the far right regular lane of the interstate, adjacent to the additional entrance lane, when he saw Mrs. Joy. Defendant claims the presence of this additional lane for traffic explains his confusion about his location on the highway. He indicates that since he was aware that there were traffic lanes on either side of his car at the time he confronted the decedent, he assumed that he was travelling in the center lane. The plaintiffs, however, use Grush's inaccurate testimony in an attempt to attack his credibility, saying the *543 defendant lied when he stated he was in the center lane.
Inconsistently, the plaintiffs want this court to accept Grush's testimony that Mrs. Joy was entering the center lane when Grush first saw her while he was traveling in the right lane. After setting forth this theory of the facts of the case, the plaintiffs imply that Grush hit the decedent only because he chose to swerve his vehicle to the left. They allege that Mrs. Joy would not have been struck had the defendant not swerved his car because Mrs. Joy had actually already cleared the right lane. However, the evidence presented at trial disputes this theory. The plaintiffs' own expert, Dr. Gregory Whitney, stated at trial that the point of impact was in the right lane, which proves beyond any doubt that not only was Grush driving in the right lane, Mrs. Joy was walking in the right lane at the time of the accident. Certainly there is no evidence to indicate that the defendant intentionally struck the decedent, as plaintiffs apparently want us to believe. Thus, the plaintiffs have failed to meet their burden of proving that defendant's swerving to the left when he unexpectedly confronted the decedent in the middle of the interstate highway constituted a violation of his duty to the decedent.

3. Driving With Defective Brakes
LSA-R.S. 32:341-343 prescribe the braking equipment required, the performance ability of brakes and the condition of brakes under Louisiana law. Essentially, these statutes require that automobiles have "brakes adequate to control the movement of and to stop and hold such vehicle," LSA-R.S. 32:341(A), and that those brakes "be maintained in good condition and in good working order." LSA-R.S. 32:343. Motorists have a duty to maintain the brakes on the vehicles they own and operate in accordance with the statutes.
Plaintiffs claim that the skid mark evidence indicates that the brakes on defendant's car were defective because one of the sets of measurements indicates the existence of only three skid marks. Plaintiffs speculate that the existence of only three skid marks indicates that one of the wheels on the right side of the Grush vehicle did not lock up when the defendant hit his brakes after becoming aware of the decedent's presence in the roadway. At trial, plaintiffs attempted to prove that the alleged defective brake caused the vehicle to veer to the left when the defendant suddenly hit the brakes. The plaintiffs attempt to combine this allegation with their theory of the facts of the case discussed in the section aboveGrush traveling in the right lane and Mrs. Joy entering the center lane at the time the defendant first saw her. They speculate that Grush never turned the steering wheel to the left in an attempt to avoid the accident, but merely hit his brakes when he saw Mrs. Joy, causing the vehicle to veer to the left because of the alleged defective brake.
First of all, as discussed above, the physical evidence presented at trial indicates that the Grush vehicle was travelling in the right lane and that Mrs. Joy was also in the right lane at the time of the impact. Therefore, the entire premise upon which this allegation is founded is flawed. Even if the premise were true, negligence on the part of the defendant cannot be founded on a series of speculations like that advanced by the plaintiffs. Most importantly, the second set of skid marks, those taken during the daytime, recorded four skid marks. Additionally, all the testimony and other evidence presented at trial indicate that the brakes were not defective.
The New Orleans Police Department inspected the Grush vehicle on July 22, 1980 and prepared a written report which was submitted at trial. The report notes that the inspecting officer did not drive the vehicle, but nonetheless concluded that the brakes were functioning normally, apparently based on visual inspection.
John Rigol, the defendant's accident reconstruction expert, stated twice that there was no evidence that the defendant's car had defective brakes. He stated that if the brakes were defective, he would have expected to find "yaw" marks, which were not present.
*544 We find that the plaintiffs failed to prove by a preponderance of the evidence that the brakes on defendant's car were defective. Therefore, the plaintiffs failed to meet their burden of proving that the defendant violated any duty to the decedent based on defective brakes.

4. Driving With Only One Headlight
Among the more specific statutory duties imposed upon motorists, pertinent to the instant case, are the following statutes relating to lighting equipment requirements:
Every vehicle upon a highway within this state at any time between sunset and sunrise and at any other time when, due to insufficient light or unfavorable atmospheric conditions, persons and vehicles on the highway are not clearly discernible at a distance of 500 feet ahead, shall display lighted lamps and illuminating devices as hereinafter respectively required for different classes of vehicles subject to exception with respect to parked vehicles.
LSA-R.S. 32:301.
A. Every motor vehicle ... shall be equipped with at least two headlamps with at least one on each side of the front of the motor vehicle, which headlamps shall comply with the requirements and limitations set forth in this Chapter.
LSA-R.S. 32:303.
Plaintiffs allege that the defendant's right front headlight was not working at the time of the accident, as required by LSA-R.S. 32:301 et seq. They claim that, since the decedent was walking into the roadway from the right side of the interstate, the alleged malfunctioning right headlight prevented the defendant from seeing the decedent in time to take the necessary evasive action to avoid the accident and therefore constituted a violation of duty.
The evidence is uncontroverted that none of the lights on the right side of the Grush vehicle were working when the automobile was inspected by Officer William Vachemin of the New Orleans Police Department nine days after the accident. We note, however, that Vachemin's accident report indicates that the battery in the vehicle was dead when the inspection was made. When questioned about how he had tested the lights when the battery was dead, Vachemin stated that he had probably jumped the car before checking it out; however, it is obvious from his testimony that, on the day of the trial, he had no independent recollection of this particular inspection. After referring to his report, he stated that the bulbs were intact. Vachemin admitted that he did not attempt to determine the cause of the malfunctioning lights, that he did not check the fuses or the wiring harness.
In support of their theory that the lights were not working prior to the accident, the plaintiffs cite the testimony of Officer Santosusso that Grush told him during the trip from Slidell to New Orleans that his right front headlight was out. Officer Santosusso stated that he had an independent recollection of Grush's statement, even though the trial took place more than seven years after the accident, because the accident occurred only two days before his birthday. However, we find that Officer Santosusso's testimony is suspect because he never questioned Grush about the alleged inoperative light when he took the defendant's formal statement, which became a part of the official report of the accident. The record shows that the statement was taken immediately after Grush arrived at the New Orleans Police station, immediately after Grush allegedly told Officer Santosusso that one of his lights was out. On cross examination, Officer Santosusso admitted that if Grush had made the alleged statement, it was important and questions should have been asked concerning this fact during the formal statement. Additionally, Santosusso admitted at trial that he never even noted Grush's alleged admission in his official report until some two weeks after the accident, after he received Officer Vachemin's report indicating the lights were not working. We were unable to verify whether that information was ever even made a part of the official report because the report was never admitted into evidence at the trial and therefore is not *545 part of the record on appeal. Grush's formal statement is a part of the recordit contains no references to the alleged malfunctioning headlight.
The only direct evidence of whether the headlight was working at the time of the accident is Grush's testimony that both lights were working. This assertion is also supported by the testimony of the plaintiffs' expert, Dr. Whitney, who stated that the physical evidence indicated that both headlights were working at the time of the accident. Whitney stated that the skid marks data supported this theory because Grush could not have begun braking as quickly as he did unless both headlights were on.
After reviewing all the evidence concerning the alleged malfunctioning headlight, we conclude that the defendant's evidence is more persuasive. Therefore, the plaintiffs failed to meet their burden of proving that the defendant violated the duties set out in LSA-R.S. 32:301 et seq. The defendant cannot be held liable for an alleged violation of duty which the plaintiffs failed to prove at trial.
In related arguments, the plaintiffs speculate that Mrs. Joy would not have been present on the highway had one of the headlights on Grush's car not been out. They speculate that Mrs. Joy thought that the one headlight was actually either an automobile with two headlights that was still a great distance away from the point where she was attempting to cross the interstate or that it was a motorcycle. They devote considerable time and space in this appeal to arguing that the only way people judge the distance between themselves and a car at night is the size of the space between the headlights. They failed to produce any definitive expert testimony to support this argument, although, after extensive cross examination, Mr. Rigol did admit that it was possible. More importantly, not only did the plaintiffs fail to prove that the headlight was actually out at the time of the accident, they also failed to prove that Mrs. Joy actually believed that the vehicle was far away or that she thought that it was a motorcycle. In fact, the only evidence of Mrs. Joy's condition at the time of the accident indicates that her perceptions were so affected by alcohol and/or drug consumption that she would have been unable to form an objective belief concerning the distance between herself and the approaching vehicle. Certainly this court cannot conclude that Grush violated a duty to the plaintiff on the basis of such unsubstantiated speculation on the part of plaintiffs' counsel.

5. Driving With Lights on Low Beam
Plaintiffs assert, in oral arguments to this court, that defendant Grush should not have been travelling with his lights on low beam at the time of the accident. However, LSA-R.S. 32:322(B) provides as follows:
B. Whenever a driver of a vehicle approaches an oncoming vehicle within 500 feet, such driver shall use a distribution of light, or composite beam, so aimed that the glaring rays are not projected into the eyes of the oncoming driver. The lowermost distribution of light, or composite beam ... shall be dimmed to avoid glare at all times, regardless of road contour and loading.
(Emphasis added.)
The above provision absolutely requires that drivers dim their lights when approaching oncoming vehicles within 500 feet, regardless of road contour or other circumstances. Uncontroverted testimony from Detective Swann, Roberta Wood and defendant Grush established the existence of heavy westbound traffic into the city at the time of the accident. Therefore, the plaintiffs failed to establish any violation of duty by defendant Grush based on his driving his vehicle with the lights on low beam.

6. Driving at an Excessive Speed
Other statutory duties imposed on motorists which are pertinent to the instant case are LSA-R.S. 32:61, which, at the time of the accident in the instant case, set the maximum speed limit at which vehicles may be operated on highways in this state at 55 miles per hour, and LSA-R.S. 32:64, which provides as follows:

*546 A. No person shall drive a vehicle on the highway within this state at a speed greater than is reasonable and prudent under the conditions and potential hazards then existing, having due regard for the traffic on, and the surface and width of, the highway, and the condition of the weather, and in no event at a speed in excess of the maximum speeds established by this Chapter or regulation of the department made pursuant thereto.
Grush testified at trial that he was going 55 mph or less at the time of the accident. In support of this claim, he stated that he was not in any hurry and that he was trying to conserve gasoline. The posted speed limit in the area where the accident occurred was 55 mph. There is no independent evidence that Grush was going faster than he said. In fact, the two accident reconstructionists who testified at trial stated that the skid mark data was consistent with Grush's testimony that he was going between 53 and 55 mph.
Plaintiffs admit that there is no independent method of determining exactly how fast Grush was driving. In fact, they do not really contest Grush's testimony on this issue. However, they claim that the circumstances of the accident indicate that Grush violated LSA-R.S. 32:64, which prohibits driving at a speed unsafe for current conditions.
There is no evidence that the weather was bad the night the accident occurred. Plaintiffs rely on their allegations that defendant's vehicle had faulty brakes and only one headlight to support their claim that he was driving too fast under the circumstances, regardless of whether he was exceeding the posted speed limit. Plaintiffs also rely on their allegation that defendant was intoxicated. However, as noted above, the plaintiffs failed to prove that defendant was intoxicated or that the brakes or headlights on his car were defective. In oral arguments before this court, plaintiffs also attempted to assert the existence of a duty to refrain from driving 55 mph with his lights on low beam on an unilluminated section of roadway where he would be unable to detect the presence of a person until it was too late to stop.
Apparently the plaintiffs want this court to fashion some kind of nebulous rule requiring drivers to limit the speed of their vehicles to that which would make it possible for them to stop within the distance illuminated by their headlights. They cite Geeck v. Jahncke, 249 So.2d 241 (La.App. 4th Cir.1971) for the proposition that drivers cannot be allowed to drive at the posted speed limit under all conditions. The Geeck case specifically addressed requiring reduced speed limits for a fully loaded truck entering a flooded section of the highway. Id. Although the rule established by the Geeck case should be applied under a variety of circumstances where it is obvious that a prudent driver would reduce his speed to avoid an accident, the plaintiffs have failed to prove the existence of any such circumstances in the instant case. Certainly this court cannot require that drivers reduce their speed every time they dim their lights, as the plaintiffs seem to request. Neither can we require that drivers always travel at speeds which would allow them to stop within the range of their headlightsthat rule would assume that the average driver is able to judge that distance with some kind of exactness, which is both unreasonable and unworkable because it would fail to apprise drivers of the law. Our review of the record convinces us that plaintiffs failed to carry their burden of proving that defendant was driving too fast under the circumstances. Therefore, the plaintiffs failed to meet their burden of proving that Grush violated any duty to the decedent based on LSA-R.S. 32:64.

7. Leaving the Scene of the Accident
Louisiana law does not specifically address this allegation. Two ancient cases out of the Orleans Circuit, which was the predecessor of this circuit court, held that evidence that a driver who knew that he had struck a pedestrian fled the scene of the accident may be considered evidence of fault. See Langenstein v. Reynaud, 13 La.App. 272, 127 So. 764 (La.App.Orl.Cir. *547 1930); Vuillemot v. August J. Claverie & Co., 12 La.App. 236, 125 So. 168 (La.App. Orl.Cir.1929). Those cases were cited by this court in Levens v. Commercial Union Ins. Co., 529 So.2d 871 (La.App. 4th Cir.), writ denied 533 So.2d 356 (La. 1988), which held that "[i]t has long been the rule in Louisiana that evidence that a driver fled the scene of an accident, knowing that he struck a pedestrian, may be considered as evidence of fault." Id. at 873. (Emphasis added.)
Defendant admits that he panicked and left the scene of the accident after seeing Mrs. Joy's body lying in the center lane of the interstate. However, this fact does not require this court to adopt the ruling from the Langenstein and Vuillemot cases, supra, because the facts of the instant case are distinguishable. In the Vuillemot case, the driver's identity was never discovered and the availability of information about how the accident occurred was therefore very limited. The court stated that the fact the accident was caused by a truck, coupled with the fact no truck stopped, indicated that the driver either failed to keep a proper lookout or that he drove away in an effort to avoid being caught.
In the instant case, the identity of the fleeing driver is known; in fact, the defendant voluntarily turned himself in at the Slidell Police Station about an hour after the accident occurred. Thus, there is no need for this court to apply the presumptions stated by the Vuillemot court. Additionally, the evidence in this case is more plentiful and indicates that the defendant neither failed to keep a proper lookout nor drove away to avoid being caught. Grush stated that he simply panicked and drove away. While this court cannot condone that action, neither can it consider the action conclusive proof of the violation of some nebulous, undefined legal duty on the part of the defendant.
The plaintiffs offer another theory concerning why the defendant's leaving the scene of the accident should be considered a violation of a duty owed the decedent. Although Louisiana has not specifically adopted the doctrine, a number of states impose a duty to aid other people harmed by one's conduct upon proof that the failure to fulfill the duty resulted in additional harm to the injured party. See the Restatement of Torts (2d), Sec. 322, p. 133. However, even in the states which have adopted that doctrine, failure to render aid per se is not presumptive proof of negligence. It is unnecessary for us to determine whether such a duty should be applied under Louisiana law because, after reviewing the evidence, we conclude that the defendant did not violate that duty, even if it exists.
At trial, the plaintiffs sought to prove, against the opinions of all three pathologists who testified, that Mrs. Joy was not killed by the initial impact with Grush's car, but that she lived at least until she was hit by the second vehicle. This testimony was presented in an effort to support the plaintiffs' claim for pain and suffering in the survival action. However, we see this argument as significant in determining whether Grush's leaving the scene of the accident would have constituted a violation of a duty to render aid, if one existed. Although all three pathologists testifying at trial stated their opinions that Mrs. Joy was killed instantly when struck by Grush's car, after extensive questioning by plaintiffs' counsel, they all admitted that it is possible that she lived for a short time thereafter. Louisiana jurisprudence recognizes a presumption of continuing life where the time of death is uncertain, until evidence is presented sufficient to establish that death occurred at some specific time or until a presumption of death established by law attaches. Fontenot v. Southern Farm Bureau Casualty Ins. Co., 304 So.2d 690, 693 (La.App. 3d Cir.1974), writ denied 307 So.2d 640 (La.1975). We hold that the plaintiffs in the instant case are entitled to the benefits of that presumption.
However, the plaintiffs still failed to establish that Grush violated a duty to render aid because they failed to prove that he could have done anything to benefit Mrs. Joy, even if he had not left the scene. *548 First, even assuming arguendo that she did not die instantly on impact, the plaintiffs have not shown that she would not have died of the injuries she received from that impact. Second, there is testimony in the record that one of the drivers who subsequently hit Mrs. Joy's body was unable to reach her until there was a break in the traffic because the traffic was too heavy. Third, even if Grush had been able to reach her body, the plaintiffs have not shown that he would have been able to protect her from other drivers. Therefore, the plaintiffs have not shown that Grush could have saved their decedent's life even if he had stopped. Thus, the plaintiffs failed to prove that Grush violated a duty to render aid to Mrs. Joy.
As the above discussion indicates, the plaintiffs failed to prove any violation of any of the numerous duties imposed by Louisiana law upon motorists for the benefit of pedestrians. Therefore, the answer to the second inquiry in the Pitre duty/risk analysisIf the defendant owed such a duty, did his conduct fall short of the standard and come within the scope set by law?is "no."
C. Cause-in-Fact
The third inquiry of the Pitre analysis is the following: "Did the defendant's negligence in fact cause damage to the plaintiff?" Under the traditional duty/risk analysis, as explained by Crowe, cause-in-fact is the initial inquiry and the question is simply whether the defendant was a cause of the plaintiffs' harm. Stated that way, we have no trouble finding that the defendant in the instant case was a cause-in-fact of the decedent pedestrian's injuries. The Pitre version of this question is unanswerable since we found in the last section that the defendant was not guilty of any violation of duty to the decedent, and thus he was not guilty of any negligence.
D. Legal Causation
Even if the defendant in the instant case had been guilty of a violation of duty which resulted in harm to the decedent, under the Pitre analysis, the plaintiffs must also prove that the defendant's negligence was a legal cause of the injury. Pitre states the inquiry as follows: Should any of the damage to the plaintiff be ascribed in law to the defendant, and, if so, should the defendant be held liable for every kind of damage done to each of plaintiff's interests?
In the instant case, the defendant asserts that even if he was negligent, that negligence was not a legal cause of the accident which resulted in Mrs. Joy's death. Essentially, the defendant seeks the benefits of the inevitable or unavoidable accident and the sudden emergency doctrines. Although often confused under Louisiana law, the two doctrines are different. Tennis v. Hartford Ins. Co., 523 So.2d 278, 281 (La.App. 2d Cir.1988). They will be considered separately for purposes of the following discussion.

1. Unavoidable or Inevitable Accident Doctrine
The unavoidable or inevitable accident doctrine has been defined by Blashfield, Automobile Law and Practice, (Rev. 3d ed.1979), as a denial of negligence, or a contention that the negligence, if any, was not a legal cause of the accident. See, supra, Sec. 101.13. The Louisiana Supreme Court has adopted the inevitable accident doctrine, quoting Blashfield in Seals v. Morris, 410 So.2d 715 (La.1981) (On rehearing, 1982), as follows:
As a corollary of the rule for determining legal responsibility for negligence, if a motorist or other traveler has exercised ordinary care as required by the common law ..., and has nevertheless been the occasion of inflicting injury on another, the accident is said to be inevitable, for which no liability attaches.
Id. at 719.
In the instant case, the defendant claims that he was unable to avoid the accident because of the decedent's gross negligence in walking on an interstate highway where pedestrians are prohibited at a time when it was virtually impossible for him to detect her presence in time to stop his vehicle before striking her. The testimony of the accident reconstructionists supports this *549 contention, establishing that the defendant could not have avoided the accident.
Under Louisiana state law, automobile headlamps on low beam are required to illuminate the roadway only 150 feet ahead of the car. LSA-R.S. 32:321. Additionally, the statutes require that a motorist operate his vehicle with his headlights "so aimed that the glaring rays are not projected into the eyes of the oncoming driver," requiring that lights be "dimmed to avoid glare at all times." LSA-R.S. 32:322. Grush testified that he was driving with his headlights on low beam at the time of the accident. Therefore, Grush's lights illuminated the roadway only 150 feet in front of his vehicle.
Mr. Rigol, the defendant's expert, testified that the roadway in question in the instant case had a coefficient of friction of .78 and that a normal reaction time upon discovering an unexpected obstacle is one second to one and one-fourth seconds. Mr. Rigol stated that people can sometimes react within three-quarters of a second if they anticipate the possibility of having to stop. He then testified as follows:
Q....
If an individual is traveling along an Interstate highway at 55 miles an hour, a road with the coefficient of friction of .78, an individual reacts within one second to some danger, how long would it take to stop that vehicle?
A. 4.2 seconds.
Q. How long in feet would it take to stop that vehicle?
A. 210 feet with a one-second reaction time.
. . . . .
Q. Mr. Rigol, I would like you to assume for me that an alert, responsible driver traveling along a highway, Interstate highway at night, that has a coefficient of friction of .78, the individual is traveling at a speed of 55 miles an hour, I want you to assume that that driver sees a pedestrian moving into his path at the range of his headlights on low beam, an approximate distance of [one hundred and] fifty feet, can that driver stop before reaching that pedestrian?
A. No.
. . . . .
Q. At what point in the slide would contact be made with the pedestrian?
A. To make contact with the pedestrian one second into the slide or two seconds after he began to react
. . . . .
Q....
Let me ask you this: Can you tell me how far footage wide into the slide the vehicle would be? ...
A. Sixty-nine feet. A little over sixty-nine feet.
. . . . .
Q. What would be the speed of that automobile at that point in time in contact, assuming that an alert, responsible driver who reacted immediately as soon as the headlights illuminated the pedestrian at a hundred and fifty feet?
A. About thirty seven and a half miles per hour.
Q. So, we will know that that vehicle is traveling thirty-seven and a half miles an hour, how many feet per second is it moving?
A. About fifty-five feet per second.
. . . . .
Q. Mr. Rigol, if an alert, responsible motorist sees a pedestrian and the pedestrian is illuminated at the outer edge of his or her headlights at a hundred and fifty feet, is there any way possible that that motorist's reaction can stop that vehicle before striking that pedestrian?
A. No.
Q. If we say that that motorist had extra good eyesight and can see twenty-five feet out beyond the range of the headlights to a hundred and seventy five feet, can he stop in time to avoid striking the pedestrian?
A. No.
Q. If the individual sees the pedestrian at a hundred and fifty feet and this *550 individual is ready for someone on the roadway and there's that three-quarters second reaction time, can that individual stop in time to avoid that pedestrian as soon as the headlamps illuminate the pedestrian at a hundred and fifty feet?
A. No.
Q. In your opinion, Mr. Rigol, when a pedestrian walks on to a roadway at night in a dark area, illuminated in the area by the headlights of a car, is spotted for the first time a hundred and fifty feet with the vehicle traveling at 55 miles an hour, and we go from a reaction of .75 to .25, or give another 25 feet of division [sic] beyond the headlights, is there any way that motorist can avoid striking that pedestrian?
A. No.
Trial transcript, Vol. IV, pages 118-23. (Emphasis added.)
Dr. Whitney, plaintiffs' accident reconstruction expert, agreed with Rigol's conclusions, as shown by the following excerpt from his testimony:
Q. I want you to assume a motorist is driving along a highway at night, fifty-five miles an hour, his headlamps are illuminating objects a hundred and fifty feet ahead [can] he stop before reaching that object[?]
. . . . .
A. No, sir, he cannot stop prior to hitting the object if it doesn't move.
Q. Can you tell me at that point when he strikes the object how far into the slide is he? ...
A. His speed at that point would be thirty seven and a half miles per hour, which translates into fifty-five feet per second.
Q. If the driver reacted immediately as soon as the headlamps illuminated the pedestrian at a hundred and fifty feet, when he strikes the pedestrian, which he can't avoid, he can't stop in time, is that correct?
A. Assuming the pedestrian is not moving.
. . . . .
Q. Let me ask you one other thing: Let's say now we have an individual, take yourself, out on the highway you haven't had anything to drink today?
A. Not that I know of.
Q. You're driving out on the Interstate, you're on low beam driving at fifty-five miles an hour, you have extremely good reaction time, three-quarters of a second, your headlamps illuminate a pedestrian a hundred and fifty feet. At three-quarters of a second can you stop?
A. No, sir.
Q. Would it be correct to say that if the motorist had seen the pedestrian the first time out on that highway, is traveling at fifty-five miles an hour, has extra good vision, sees her at a hundred and seventy five feet, can he stop in time?
. . . . .
A. One second. It will take two hundred and ten feet.
Q. So, he still can't is that correct?
A. That's correct, sir.
Q. Under none of those hypothetical situations I gave you at fifty-five miles an hour, one second reaction, seeing a pedestrian anywhere from a hundred fifty to two hundred feet, there's no way to stop in time, is there?
A. Assuming that pedestrian is not moving, no sir.
Q. In other words, assuming the pedestrian doesn't move out of the way, there's nothing the motorist can do?
A. No, sir, not as far as braking or stopping.
Trial transcript, Vol. II, pages 193-96. (Emphasis added.)
Therefore, the experts agreed Grush could not have avoided the accident which caused the decedent's death. As stated above, the physical evidence indicated that both of the defendant's headlights were working. Since the night was *551 very dark, it is reasonable to conclude that the defendant did not see the decedent in the roadway until she was illuminated by the headlights of his car, which only projected 150 feet. This court has previously reversed a trial court's decision finding a motorist liable for injuries arising out of a traffic accident on the basis of a finding that the expert testimony concerning total stopping distances established that the accident was unavoidable from the standpoint of the motorist. See Messina v. Bowen, 415 So.2d 351 (La.App. 4th Cir.), writ denied 420 So.2d 170 (La.1982). The record in the instant establishes that the accident in question was unavoidable. Additionally, in argument before this court, plaintiffs' counsel admitted that defendant Grush was unable to stop his car in time to avoid hitting the decedent, stating that the "evidence is clear that a vehicle travelling at 55 mph cannot stop in 150 feet."

2. Sudden Emergency Doctrine
In contrast to the unavoidable or inevitable accident doctrine, which negates any causal connection between possible acts of negligence and the accident, the sudden emergency doctrine "serves to excuse the otherwise prudent motorist for emergency conduct which, on sufficient reflection, was not the most prudent course of action." Edwards v. Sims, 294 So.2d 611, 613 (La. App. 4th Cir.1974). The sudden emergency doctrine therefore exonerates a defendant who selects an evasive action which subsequently proves unsuccessful, so long as he was not negligent prior to the arising of the emergency situation. Murphy v. Allstate Ins. Co., 295 So.2d 29, 33 (La.App. 2d Cir.), writ ref'd 299 So.2d 787 (La.1974).
In explaining the sudden emergency doctrine, the court in Windecker v. Fekete, 221 So.2d 887 (La.App. 1st Cir.1969), indicated that though hindsight might prove that the defendant could have avoided striking the plaintiff by quickly turning, the defendant "cannot be held to the same cool and deliberate operation of [the] vehicle as would obtain in a situation where she was not confronted with a sudden emergency." Id. at 889.
As discussed in the section concerning violation of duty, the plaintiffs claim that the defendant violated a duty to the decedent by swerving his vehicle to the left when he discovered Mrs. Joy's presence in the roadway. We found that the plaintiffs failed to prove that allegation because the premise behind the contentionthat the defendant was driving his automobile in the left lane and Mrs. Joy was walking in the center lanewas disproved by the physical facts. We failed to discuss the plaintiffs' implied contention that the defendant could have avoided the accident by choosing to swerve his vehicle to the right, rather than the left.
First of all, the plaintiffs presented no evidence at trial to prove that the accident would not have occurred had the defendant chosen to swerve to the right. Even if they had, the defendant's uncalculated, split-second decision to swerve the vehicle to the left could not serve as the basis for a finding of liability on the part of the defendant because of the sudden emergency doctrine.
As the above discussion indicates, the plaintiffs failed to prove any causal relationship between any of the alleged acts of the defendant and the accident which resulted in Mrs. Joy's death. Therefore, the answer to the fourth question of the Pitre inquiry is "no."

CONCLUSION
After reviewing the entire record, and analyzing the evidence in light of Louisiana law existing at the time of the accident, this court finds that the accident in question in the instant case is distinguishable from Baumgartner, supra, because Grush "was not negligent since he discovered the pedestrian as soon as it was possible to do so, and did all in his power to avoid the collision." 356 So.2d at 407. The jury's conclusion to the contrary is manifestly erroneous and therefore must be reversed. The basis for our reversal of the jury's decision is the presence of objective evidence, presented by all experts and conceded to by the plaintiffs, that, under the circumstances, the defendant could not *552 have stopped his vehicle in time to avoid striking the decedent. All the allegations of negligence on the part of the defendant presented by the plaintiffs were based on speculation and conjecture and not upon any direct evidence. Because the jury's verdict was based upon conjecture, and is contradicted by the objective evidence presented in the case, this court is not prohibited by the Louisiana Supreme Court's decision in Rosell, supra from finding that the verdict is manifestly erroneous. Having found the lower court's decision manifestly erroneous, we were required to evaluate the case de novo and render a new decision. Id.
For the above and foregoing reasons, we find that the plaintiffs have failed to meet their burden of proving any violation of duty on the part of the defendant which caused the death of the plaintiffs' decedent. Additionally, they have failed to prove any causal relationship between the defendant's actions and the accident. The defendant, on the other hand, presented sufficient evidence to prove his entitlement to the benefits of the unavoidable or inevitable accident and the sudden emergency doctrines. Therefore, the judgment of the trial court awarding plaintiff Marcia Shroyer, as provisional tutrix of the minor child, Trina L. Joy the sum of $710,000 and awarding plaintiff Rick Wayne Joy the sum of $45,000 against defendants Guy T. Grush and United Services Automobile Asso. is reversed. Plaintiffs' actions are dismissed.
REVERSED AND RENDERED.
BARRY, J., dissents with reasons to follow.
BARRY, Judge, dissents with reasons.
The majority manifestly errs by totally ignoring the reasonable factual basis for the jury's unanimous verdict.
The majority correctly finds that "there is arguably a `reasonable factual basis' to support the jury's conclusion that Grush was negligent on the night in question", then pole vaults over that admission and concludes that "plaintiff's recovery against Grush is nontheless `clearly wrong' because the plaintiff failed to establish that Grush's alleged negligence was the legal cause of the accident."
The standard for appellate review of fact was recently spelled out in Rosell v. ESCO, 549 So.2d 840, 844 (La.1989):
[B]ut if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong.... In applying the manifestly erroneousclearly wrong standard to the findings below, appellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo. (emphasis added). (citations omitted).
The majority claims to recognize the ESCO standard, then continues: "[T]he Supreme Court allowed that even decisions based on the acceptance of one witness' story over another may properly be reversed when objective evidence contradicts the witness' story." At 538. That statement is irrelevant since this case has only one witness to the accidentthe defendant-driver Grushwhom the jury obviously concluded lacked any credibility.
Justice Brandeis said: "Let me prepare the statement of facts, and I care not who argues the law." Despite a voluminous record of over six volumes accumulated during a lengthy trial, the majority attempts to set forth the facts in six short paragraphs, two of which refer to matters after the accident which shed no light on the cause of the fatality.
Does the record contain a reasonable factual basis for the jury to conclude that Grush's negligence caused Lyndell Joy's death? Yes.
In ESCO, 549 So.2d at 844, the Supreme Court emphasizes "reasonable":
The appellate review of fact is not completed by reading only so much of the *553 record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the Court of Appeal may not reverse although convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. (emphasis added).
As noted above, the majority acknowledges that there is a reasonable factual basis to support the jury's conclusion that Grush was negligent in the operation of his vehicle.
The majority leans on Baumgartner v. State Farm Mutual Automobile Ins. Co., 356 So.2d 400 (La.1978) and cites Mequest v. Algier Mfg. Co., 147 La. 364, 367 84 So. 904, 905 (1920) for the proposition that pedestrians crossing highways at points other than designated crosswalks "do so in large measure at their peril." The majority interprets Baumgartner: "Motorists are considered responsible for injuries to a pedestrian, despite the existence of contributory negligence on the part of the pedestrian, only when the operator could reasonably have avoided the accident." At 539, quoting Baumgartner, 356 So.2d at 405, quoting Guilbeau v. Liberty Mutual Ins. Co., 338 So.2d 600, 604 (La.1976). The majority concludes that Baumgartner was "never intended to protect a pedestrian who was grossly negligent in walking on an interstate highway where he is prohibited from walking...." At 539. In other words, the majority says that what the defendant-driver did prior to the accident and the condition of his vehicle are totally immaterialthe majority finds absolute liability when a pedestrian crosses an interstate regardless of the circumstances on the highway. I disagree, and so did the unanimous jury.
Confusingly the majority finds that Grush did not breach a duty but he was negligent, then makes a duty/risk analysis and concludes Grush was not negligent. The majority clings to Pitre v. Opelousas General Hospital, 530 So.2d 1151 (La.1988) and answers affirmatively that Grush's negligence caused the damage or was the cause in fact of the damage.
I am satisfied that all four elements of delictual responsibility specified in Pitre are answered in plaintiff's favor.
(1) GIVEN THE RELATIONSHIP AND CIRCUMSTANCES OF THE PARTIES, DOES THE LAW IMPOSE UPON THE DEFENDANT A DUTY OF REASONABLE CONDUCT FOR THE BENEFIT OF THE PLAINTIFF, THE VIOLATION OF WHICH IS CONSIDERED TO BE FAULT?
The majority opinion answers "Yes" and concludes that "the law does impose upon the defendant in this case a duty of reasonable conduct for the benefit of the plaintiff, the violation of which is considered to be fault." (emphasis added). At 541. That conclusion despite the finding of absolute liability on the plaintiff.
(2) IF THE DEFENDANT OWED SUCH A DUTY, DID HIS CONDUCT FALL SHORT OF THE STANDARD AND COME WITHIN THE SCOPE SET BY LAW?
The majority consumes 17 pages to analyze the plaintiff's various claims of negligence by driver Grush:
A. The majority stonewalls the fact that Grush's blood alcohol level was .07% and concludes he was not physically or mentally impaired. To reach that conclusion the majority ignores Officer Santosusso who testified that he smelled alcohol on Grush more than one hour after the accident when the defendant turned himself in to the Slidell Police. The majority also ignores Dr. Samuels who estimated the .07 alcohol level and stated in his expert opinion that Grush might have experienced "impairment". Could the jury have reasonably concluded that Grush was impaired? Yes.
B. Did Grush swerve to the left and strike the defendant after he changed lanes? Grush testified he was in the center lane of the interstate before he swerved to the left. If that was true the vehicle would not have killed the decedent. Skidmarks on the scene show that Grush was in the right lane. The majority *554 acknowledges "Grush's inaccurate testimony", then astonishingly states: "Certainly there is no evidence to indicate that the defendant intentionally struck the decedent, as plaintiffs apparently want us to believe." I do not find anywhere in the pleadings, in the trial record, in briefs or oral argument, any allegation that this tragic accident was intentionally caused by Grush. The bottom line is that Grush's testimony was inconsistent as to his lane of travel; however, he did state that he swerved to the left and struck the decedent. All of that was sufficient for the jury to discredit or disregard Grush's testimony in its entirety. Could the jury have reasonably disregarded Grush's testimony? Yes.
The majority totally discounts the possible existence of defective brakes on Grush's vehicle. Plaintiffs rely on measurements taken the night of the accident which show only three tire skidmarks, a clear indication that a wheel on the right side of the vehicle did not brake. A second set of skidmarks measured the following day show four tire tracks. Which measurements are proper? Isn't that a matter for the jury? Despite making a written report, the inspecting police officer did not test-drive the vehicle or check the brakes. Mr. Rigol, the defendant's reconstruction expert, made no authoritative conclusion. Could the jury have reasonably concluded that the brakes were defective? Yes.
D. Did Grush's vehicle have only one working headlight? The majority acknowledges the evidence is uncontroverted that none of the lights on the right side of the defendant's vehicle were working when inspected by the police after the accident. For some reason the majority notes that the police report states that the battery in the vehicle was dead when the inspection was made. If that was so, why were only the lights on the right side out? The police officer responded that he probably jumped the battery before checking the vehicle, but the fact remains that none of the lights on the right side were working when checked by the police. Officer Santosusso testified that Grush admitted to him during the trip from Slidell to New Orleans (shortly after the fatality) that the vehicle's right front headlight was not working. For no apparent reason, the majority (as if by cross-examination) questions Officer Santosusso's testimony. The majority then concludes that the vehicle's lights had been working based on the defendant-driver's self-serving formal statement made hours later to the police. Could the jury have reasonably concluded that the vehicle had only one working headlight? Yes.
Plaintiffs argue that with only one headlight the decedent could have assumed the vehicle was a greater distance away when seen by the decedent, or that the approaching vehicle was a motorcycle. Mr. Rigol, the expert, admitted that perception was possible. The majority gratitously states that decedent's perceptions were affected by alcohol and/or drug consumption so "that she would have been unable to form an objective belief concerning the distance between herself and the approaching vehicle." At 545. That statement has no foundation. According to the autopsy report and testimony from Coroner's Office pathologists Drs. McGarry and Samuels, there was no urine for a sample and the decedent's bladder washings tested negatively for drugs. There was insufficient blood in the sample to determine the amount of alcohol present (only a qualitative test was possible) and the blood sample was negative for drugs. There was no expert testimony to prove any degree of intoxication or if plaintiff's perceptions were affected when she was killed. Could the jury have reasonably concluded that the decedent thought the approaching vehicle with only one headlight was a greater distance away or a motorcycle? Yes.
E. Was the defendant driving at an excessive speed? The defendant testified that he was driving 55 m.p.h., the legal limit. There is no evidence to indicate that he was going any faster. The question is whether that was a reasonable speed if the vehicle had defective brakes, only one headlight, and the driver was *555 impaired? I feel it is reasonable to argue that if a vehicle is defective then it is a dangerous instrumentality if driven at a speed which could cause or contribute to an accident, even if that speed is within the limit. The circumstances of this case could have required that a prudent driver would reduce his speed under these circumstances. See Geeck v. Jahncke, 249 So.2d 241 (La.App. 4th Cir. 1971). Could the jury have reasonably concluded that the defendant-driver was imprudent? Yes.
F. Does leaving the scene of the accident constitute a basis to be considered evidence of fault? The majority refers to "two ancient cases." Langenstein v. Reynaud, 13 La.App. 272, 127 So. 764 (La.App. Orl.Cir.1930) and Vuillemot v. Claverie & Co., 12 La. App. 236, 125 So. 168 (La. App. Orl.Cir.1929). Those cases were cited in a recent case, Levens v. Commercial Union Ins. Co., 529 So.2d 871 (La.App. 4th Cir.1988), writ denied 533 So.2d 356 (La.1988). Levens held that it has long been the rule in Louisiana that evidence of a driver fleeing the scene of an accident knowing that he struck a pedestrian, may be considered evidence of fault. The defendant testified that he fled the scene after seeing Mrs. Joy's body lying on the road. The majority attempts to distinguish Vuillemot, but ignores Langenstein and the 1988 Levens case. The majority then states that it cannot consider the defendant's leaving the scene "conclusive proof of the violation of some nebulus, undefined legal duty on the part of the defendant." At 547. The holding in Levens is not nebulus or undefined. Nor does Levens state that leaving the scene is "conclusive proof" of anything. Rather, Levens holds that leaving the scene may be considered evidence of fault. Could the jury have reasonably concluded that the defendant's leaving the scene was evidence of fault? Yes.
The third element of Pitre requires that the defendant's negligence in fact caused damage to the plaintiff. The majority states: "[W]e have no trouble finding that the defendant in the instant case was a cause-in-fact of the decendent pedestrian's injuries." At 548.
4. SHOULD THE PLAINTIFF'S DAMAGES BE ATTRIBUTED BY LAW TO THE DEFENDANT, AND IF SO, SHOULD THE DEFENDANT BE HELD LIABLE FOR EVERY KIND OF DAMAGE?
The majority relies on the defendant's expert, Mr. Rigol, and extensively quotes his testimony based upon hypothetical questions which are in no way related to the facts of this accident. The hypothetical questions are without factual foundation here because:
(1) They refer to an "alert, responsible driver";
(2) That the driver had "extra good eyesight" (not a part of this record);
(3) That the headlamp(s) were working (not a proven fact).
When the defendant's expert, Dr. Whitney, was questioned, it was premised on hypotheticals which are nonexistent here:
The headlamp(s) are illuminating objects;
The assumption that the pedestrian was not moving (an unknown);
The hypothet was based on Dr. Whitney personally;
That Grush had not been drinking, which he had admitted.
The hypothetical questions are based on facts that are assumed and not facts of this case.
The record raises serious doubts as to whether the accident was unavoidable. Grush did not carry that burden of proof.
Nor is the sudden emergency doctrine applicable because it is based on a "prudent" motorist who is not negligent. The majority concedes Grush was negligent.
Somehow the majority concludes that "the jury's verdict was based upon conjecture, and is contradicted by the objective evidence presented in the case....." At 552. I respectfully submit that the evidence is sufficient for a reasonable jury to conclude by a preponderance of the evidence that defendant Grush's negligence was the cause of Mrs. Joy's death.

*556 DIRECTED VERDICT AS TO DR. GRUSH
Dr. Grush claimed on his insurance policy that he was the owner of the vehicle. He substantiated his ownership by answering interrogatories which specify that he owned the vehicle. The vehicle was classified as an "owned car" on Dr. Grush's insurance policy.
Plaintiffs attempted to verify Dr. Grush's ownership by interrogatories and requests for production of documents. Neither Dr. Grush nor his son complied with those requests, and their failure to comply should be construed against Dr. Grush.
The insurance policy creates a presumption that Dr. Grush owned the vehicle.
I therefore conclude that it was error to grant a directed verdict as to Dr. Grush.