702 So.2d 902 (1997)
Tina MILLER, et vir., Plaintiffs-Appellants,
v.
Louise P. DUPONT, et al., Defendant,
State of LouisianaAppellant,
Hartford Insurance CompanyIntervenor,
Village of PlauchevilleAppellee.
No. 97-267.
Court of Appeal of Louisiana, Third Circuit.
October 8, 1997.
*903 Darrel Dee Ryland, Joseph Blaise Treuting, Marksville, for Tina Miller, et vir.
Robert Lewis Bussey, Asst. Dist. Atty., Lewis O. Lauve, Jr., Asst. Atty. Gen., Alexandria, for State.
Kenneth Leo Riley, Baton Rouge, for Hartford Insurance Company.
Steven J. Bienvenu, Opelousas, Paul A. Holmes, Baton Rouge, for Village of Plaucheville.
Before YELVERTON, PETERS and PICKETT, JJ.
YELVERTON, Judge.
This case involves a one-car accident which occurred on Louisiana Highway 107 in Avoyelles Parish on October 4, 1990. Tina Miller, the injured plaintiff, employed with Evangeline Medi Van, was transporting a patient in a car driving south on the highway. At the same time Louise Dupont was also traveling south in her car ahead of Miller.
Miller, going 55 miles per hour, caught up with Dupont, going 35 miles per hour, and decided to pass her. When Miller moved into the passing lane, Dupont moved over into Miller's lane. Miller braked, lost control, went off the road, and collided with a culvert. Dupont's and Miller's vehicles never touched each other. Dupont continued down the highway, turned around in a driveway, and came back to check on Miller. Miller sustained serious injuries.
*904 Miller and her husband sued several parties for damages. The insurers of the accident parties settled, the Village of Plaucheville was dismissed, and by the time of trial the only remaining party was the Louisiana Department of Transportation and Development (DOTD). The DOTD was not added to the suit until nearly two years after the accident. After trial, the court found that there was an unreasonably dangerous hole in the highway that was a cause of the accident. It assessed the DOTD with 80% of fault for the accident and Dupont with 20%. Miller was awarded damages in the following amounts: (1) Past Medical Expenses$53,233.38; (2) Future Medical Expenses$50,000; (3) Loss of Income (Past, Present and Future)$100,000; (4) General Damages $350,000; and (5) her husband was awarded for Loss of Consortium$25,000.
The DOTD appeals the judgment alleging errors with regard to the assessment of its fault. It also appeals the trial court's finding that there was an unreasonably dangerous condition on the highway that caused the accident. Additionally, it claims that the trial court abused its discretion in its award of future medical expenses and general damages.
The Millers answered the appeal asking that the DOTD's fault be increased to 90%. They also asked for an increase in the awards for loss of income, loss of consortium, and general damages.

THE DEFECT
As one drives south on Highway 107 through the community of Plaucheville, where this accident happened, there is a church on the east side of the road, or the driver's left. A concrete parking lot belonging to the church extends from the front of the church up to the highway and abuts the highway. It was on this parking lot that the plaintiff's car left the highway when she was forced to apply her brakes and lost control. Her car went off the south edge of the parking lot into a ditch and traveled parallel to the highway until it encountered the culvert. According to the state policeman, Trooper Nathan Beauboeuf, who investigated the accident, the plaintiff's car traveled 204 feet after it left the highway before it hit the culvert.
There is no doubt in this case that Dupont moved over into the left lane to avoid some surface problem on the highway. At the time of this accident in 1990, there were two road problems on Highway 107 in that vicinity, both on the same southbound lane, but one was north and the other was south of the church parking lot. We can refer to these road problems as patches because that is what they are today; both road problems have been patched. These highway patches, or repairs, were present when the case was tried in 1996. What these conditions looked like in 1990 when the accident happened had to be established by the testimony of witnesses who were familiar with the conditions in 1990. The DOTD argued at the trial and argues before us, with some evidentiary support, that it was the problem now covered by the north patch that Dupont was trying to avoid that forced the plaintiff off the road. The reason why the DOTD would like to show that Dupont's maneuver was to avoid the north patch is that no evidence exists in the record to demonstrate that that patch was the repair of a condition that was unreasonably dangerous on the day of the accident.
The trial judge found that it was the condition now overlaid by the south patch that Dupont went around to avoid. That condition was thoroughly explored and described in the testimony, and the trial judge made specific findings about it. We quote from the trial court's reasons for judgment:
The evidence clearly establishes that at the time of the accident, there was a large washout or "hole" in the southbound lane of Louisiana Highway 107 at and near the driveway of John Russell Mayeaux, a witness in this case. Further, that the "hole" was a large and obvious defect in the roadway. The "hole" was 2-3 feet long, 2 feet wide, and about 8 inches deep. It consumed most of the southbound lane of travel and extended from the shoulder of the road to the centerline of the road. Mr. Mayeaux, a witness in this case, reported and complained of this "hole" several times prior to the accident. The most recent complaint by Mayeaux was approximately *905 two months before the accident. The "hole" forming the subject of this case is generally known and referred to by the residents of the community of Plaucheville as the "hole". It was this "hole" that the defendant-driver, Mrs. Dupont tried to avoid.
It was clearly established that the local residents and Mrs. Dupont routinely "went around" the "hole", due to the severe nature of the condition, i.e., the "hole". This court is of the opinion, therefore, that the condition of Louisiana Highway 107 at that spot was, in fact, a defective condition which was known to DOTD for the reasons stated. The nature and existence of this "hole" presented an unreasonable risk of harm to drivers. DOTD knew about the "hole". Mr. Lawrence Adams testified that he knew about this problem, i.e., the "hole". He was the DOTD engineer and supervisor at the time. Mr. Lawrence [Adams] testified that he knew of this condition because the City had dug in that spot to repair a water leak. He further testified that he was upset with the City of Plaucheville because the City had not been given permission to dig and had not correctly repaired the area. Thus, actual knowledge.
Donnie Deshotel was an eyewitness. He lived across the highway from the church, and he was in his front yard working on a car in the rain. When he heard the driver of the Miller car "hit her brakes," he looked up and saw the rest of the accident develop. He described the hole in the road which was about 150 feet south of his driveway. He said that if a car hit it, "It sounded like you was [sic] tearing up your car or something." The hole had been there for eight months to a year, and everybody around Plaucheville knew to avoid it.
On the subject of cause-in-fact, the trial judge had this to say:
The defendant-driver, Mrs. Dupont, is an elderly, but very astute lady who explains that she was aware of the "hole" and routinely "went around" it (the "hole") in order to avoid damage to her vehicle or loss of control. Because of the "hole" and the obvious danger that it posed, this court finds that it is reasonable that a person would go around it or avoid going over it. Donnie Deshotel, a nearby resident and impartial witness in this case, indicated that he routinely "went around" the "hole" and that from his observation a vehicle that "hit" the "hole" would "catch hell". Further, that large trucks hitting the "hole" would cause the ground beneath the surrounding homes to "shake". Mr. Mayeaux further testified that he could not sleep at night because of the noise and shaking of the ground beneath his home caused by the vehicles hitting the "hole". When asked of Mrs. Louise Dupont, the defendant-driver, why she routinely went around the "hole" she replied, "We all do that." This court is of the opinion that a reasonably prudent person in ordinary circumstances, would not encounter or attempt to overpass this type of condition and would take reasonable measures to avoid traveling over such an obstacle, just as the local residents and Mrs. Dupont did. Therefore, the court is of the opinion that but-for the "hole", Mrs. Dupont would have remained in her lane of travel.

LIABILITY
To recover damages from a public entity, the plaintiff must prove that: (1) the public entity had ownership or control of the thing which caused the damage; (2) the thing was defective in that it created an unreasonable risk of harm; (3) the public entity had actual or constructive knowledge of the defect and failed to take remedial measures within a reasonable time; and, (4) causation. Miller v. Evangeline Parish Police Jury, 95-566 (La.App. 3 Cir. 10/11/95), 663 So.2d 398. As indicated by the above-quoted findings of the trial judge, the plaintiff in the present case met all four requirements of proof to establish that the DOTD was liable. We find no manifest error in these factual conclusions.

COMPARATIVE FAULT
The trial judge found no fault on the part of Tina Miller, the plaintiff. There is no manifest error in that finding.
*906 The trial judge assessed fault as between Dupont and the DOTD at 20% and 80% respectively. We find manifest error in this apportionment.
Dupont, who was 82 at the time of trial, was well aware that the defect existed. She was accustomed to going around it. In fact, so mindful was she of the existence of the hole and the need to go around it that she began her passing maneuver some 300 feet north of it. She testified that she was aware that there was a car behind her, for she had looked in her rearview mirror before moving over into the other lane, but she thought the car was way back. As to her driving, the trial judge opined:
Since Mrs. Dupont was aware of the condition and perhaps should have observed the plaintiff's approach, perhaps Mrs. Dupont could have taken some action to avoid entering the passing lane. Perhaps she could or should have observed the passing car and stopped. This did not happen. This court cannot speculate what Mrs. Dupont "should have done" or "would have done". The evidence indicates that Mrs. Dupont did not see plaintiff's vehicle approaching because she was concerned about the "hole" which she was familiar with. Again, the defective condition, i.e., the "hole", is now culprit as to Mrs. Dupont perhaps not seeing the plaintiff's vehicle and observing what she should have observed, i.e., a passing motorist, namely the plaintiff. Again, the defective condition draws upon the attention of Mrs. Dupont so as to cause her to derogate from normal driving practices, giving rise if not in whole, in part, to the accident.
Considering these findings of fact, Dupont's relatively slow speed, the considerable distance she was from the hole when she began to pass, and her concern about the hole which she was familiar with, we cannot agree that her allocation of fault should be as little as 20%.
In allocating shares of negligence the supreme court has given us a familiar guide in the case of Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967, 974 (La.1985), as follows:
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.
Applying these factors, and in the light of the actual facts regarding Dupont's conduct as found by the trial judge, we find that the allocation of 80% to the DOTD and 20% to Dupont was clearly wrong. We find that the DOTD was at least 25% at fault but no more than 50% at fault. Therefore, in accordance with the rules announced in Clement v. Frey, 95-1119, 95-1163 (La.1/16/96), 666 So.2d 607, we decrease the DOTD's fault to 50%, which is the highest that the district court could reasonably have allocated to the DOTD. At the same time we increase the fault of Dupont from 20% to 50%, because we find her fault was not less than 50%, but no more than 75%, and we increase it to the lowest amount the district court could have reasonably allocated to her.

DAMAGES
The DOTD appeals the award of $350,000 to Miller for general damages. The Millers ask that we increase this award to $750,000. The DOTD also appeals the award of $50,000 for future medical expenses. The Millers also ask that we increase the award for loss of wages from $100,000 to $180,000. We will address each of these awards separately.

General Damages

Tina Miller
[T]he role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion *907 by the trier of fact. Each case is different, and the adequacy or inadequacy of the award should be determined by the facts or circumstances particular to the case under consideration.
The initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the "much discretion" of the trier of fact. Only after such a determination of an abuse of discretion is a resort to prior awards appropriate and then for the purpose of determining the highest or lowest point which is reasonably within that discretion.
[T]he discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260-1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994) (Citations omitted.).
Miller was seven months pregnant at the time of the accident. Not only was she concerned about her unborn child, but she was personally injured in the accident. As a result of the impact, Miller's chin hit the steering wheel. Her chin was cut. She also experienced neck and back pain. She was taken to the emergency room at Rapides Regional Medical Center and released several hours later.
The next day Miller sought treatment from Dr. Robert Levy, an oral surgeon. Dr. Levy opined that Miller was suffering from temporomandibular joint (TMJ) condition bilaterally. Miller complained of ringing in her ear and headaches. Conservative treatment, which included moist heat, soft diet, an orthotic splint, and pain medication, was first attempted after a healthy baby was born.
On April 22, 1991, Dr. Levy performed a bilateral TMJ arthroscopy. However, the popping and crunching in Miller's jaw worsened. Her headaches also worsened. Splint therapy was ordered along with severe diet restrictions. Dr. Levy recommended another surgery.
Miller also saw Dr. L.J. Mayeux on October 10, 1990. Her symptoms were knee pain, lower back pain, and neck pain. She was treated with physical therapy. After the baby was born, she began taking muscle relaxants, anti-inflammatory medication, and pain medication. Dr. Mayeux then referred Miller to an orthopedic surgeon, Dr. Louis Blanda.
Dr. Blanda first saw Miller on May 26, 1992. MRIs of the cervical and lumbar region revealed disc bulges at C5-6 and C6-7 with a very significant disc herniation at L4-5 that was causing a complete block of the spinal canal. He related all of these problems to the accident. On February 22, 1993, Dr. Blanda performed a bilateral lumbar laminectomy and diskectomy at L4-5. A fusion was also performed.
An MRI on October 26, 1995, revealed that the discs in the cervical region were now herniated. Dr. Blanda recommended a two-level anterior cervical fusion. As a result of these cervical problems, Dr. Blanda stated that Miller had a 15% impairment of the back and 15% impairment of the neck for a total body permanent function impairment of 30%. Dr. Blanda opined that in the future, Miller would be able to return to sedentary employment.
Dr. Randall Lea, another orthopedic surgeon, agreed with the finding of herniations at C5-6 and C6-7. He stated that this was a significant impingement.
Dr. George Hearn, a psychologist, stated that Miller was depressed and this depression was related to her new life-style. He agreed that she will have to look for sedentary work.
Miller testified regarding the pain and problems she has suffered as a result of the accident. Her family members also testified about the changes in Miller since the accident. *908 They testified that since the accident she has put on weight due to her sedentary lifestyle, has been depressed, and is not outgoing anymore. They also talked about the pain she suffered as a result of her injuries.
Under these circumstances we cannot say that the trial court abused its much discretion in its award of $350,000 in general damages. Considering the numerous problems Miller has to deal with, $350,000 seems appropriate. We also do not feel that the award is too low. With surgery, the doctors are optimistic about Miller's recovery.

Mr. Miller
In their answer to the appeal, the Millers ask that we increase the award of $25,000 to Mr. Miller for loss of consortium. However, this issue was not briefed, and we consider it abandoned. Uniform Rules, Courts of Appeal Rule 2-12.4.

Special Damages
Special damages are damages which can be established with reasonable mathematical certainty. Stevens v. Winn-Dixie of Louisiana, 95-0435 (La.App. 1 Cir. 11/9/95), 664 So.2d 1207. The DOTD appeals the award for future medical expenses, and the Millers appeal the award for loss of wages.

Future Medical Expenses
The plaintiff must show that it is more probable than not that these expenses will be incurred. Unless medical testimony is presented, setting out the probable cost of treatment and verifying that treatment is needed, an award of future medical expenses will not be made.
Myers v. Broussard, 96-1634, p. 22 (La.App. 3 Cir. 5/21/97), 696 So.2d 88, 99-100 (Citations omitted.).
Dr. Levy testified that Miller is in need of bilateral arthroscopic surgery which will cost $5,500. The surgery center charges will cost around $2,205, and the anesthesia will cost $625. Miller will also need physical therapy after the surgery which will cost $800.
Dr. Blanda testified that the two-level anterior cervical fusion will cost $13,209.20. The hospital cost will be approximately $13,000. Although Dr. Lea recommended conservative treatment at first, he agreed that surgery might be necessary.
Dr. Hearn testified that after Miller undergoes the two surgeries, she would need a major reassessment. The cost could range from $1,000 to $5,000.
Dr. Mayeux stated that he wanted to continue treating Miller to check on her depression and chronic pain. Given her surgery schedule, he wanted to see her every two weeks and then monthly.
Actual costs given by the doctors total $40,339.20. This does not take into account the cost of office visits to Dr. Mayeaux, any prescription medication, and possible other costs that may be incurred as a result of the two surgeries. Giving deference to the trial court, we find no error in an award of $50,000 for future medical expenses.

Loss of Wages
At the time of the accident, Miller was employed as a driver for a medical transportation service. She began working for Evangeline in 1989. During this time period, she also delivered some papers. Before this, Miller was a housewife. Miller has a ninth-grade education, but she received her GED.
Dr. Jan Dugar, a professor of finance and dean of the College of Business at USL, was the only expert to testify regarding Miller's loss of wages. She took only Miller's 1989 earnings into consideration. Dr. Dugar stated that she did not have a lot of information regarding Miller's earnings prior to 1989.
Dr. Dugar estimated Miller's wage loss from the date of the accident to February 28, 1996, to be $44,542. She also indicated that Miller incurred an additional loss of $3,407 for the employer's contribution to social security.
Dr. Dugar further testified that Miller had a work-life expectancy of 17 years. Her lifetime remaining loss of earnings, using discount factors, would be $134,590. If Miller were able to return to work a year later at $4.25 an hour, her loss would be $71,252.
*909 Given this evidence and Miller's work history, we find that the trial court did not abuse its discretion in an award of $100,000 for loss of wages.
For the foregoing reasons, the judgment is amended to assess comparative fault at 50% to the DOTD and 50% to Louise Dupont. In all other respects, the judgment is affirmed. Costs of appeal will be paid by the plaintiff, Tina Miller.
AMENDED IN PART, AND AS AMENDED, AFFIRMED.