718 So.2d 975 (1998)
Joseph T. MARTIN, et al., Plaintiffs-Appellants,
v.
Michael G. PROVENCHER, et al., Defendants-Appellees.
No. 97-1648.
Court of Appeal of Louisiana, Third Circuit.
May 6, 1998.
Writ Denied July 2, 1998.
Alfred V. Pavy Boudreaux, for Joseph T. Martin, et al.
L. Lane Roy, Lafayette, for Michael G. Provencher, et al.
Julius Willis Grubbs, Jr., New Iberia, for J.B. Talley & Company, Inc., et al.
James Brady, for Safeway Insurance Co., et al.
Jack W. Harang, William C. Wells, V, for Raymond Darson.
Before WOODARD, AMY and GREMILLION, JJ.
AMY, Judge.
This matter arises from a 1994 automobile accident in which Joseph T. Martin, and his passenger, Raymond Darson, allegedly sustained injuries. Both parties filed petitions seeking recovery for their alleged injuries. Following a consolidated trial on the matters, judgment was entered against the plaintiffs. Each now appeals assigning error in the *976 determination in the lower court. We affirm both decisions.

Factual and Procedural History
The automobile accident at issue in the case now before us occurred on June 17, 1994, on Louisiana Highway 93. The record indicates that Michael G. Provencher was northbound on the rural highway when he encountered road construction. This work was being performed, under state contract, by J.B. Talley & Co. Provencher testified that he was stopped by a road grader in his lane of traffic and then proceeded to the left of the grader after the operator flagged him around. The operator, Wesley Harrison, denied ever signaling him to go around. Provencher also related that, when he was at the side of the road grader, he saw the oncoming car which was driven by Joseph T. Martin.
Provencher further testified that, upon seeing the southbound car, he stopped and put his vehicle into reverse. He stated that, upon impact with the Martin vehicle, he hit the accelerator and reversed his car. Photographs of the vehicles, which were entered into evidence, indicate that both cars sustained front-left damage.
Martin testified that he and Darson had previously passed the construction site earlier in the day and that, on this second approach, he first noticed the grader when he was approximately one hundred to one hundred fifty feet away. He further stated that he was traveling at thirty-five miles per hour in the forty-five mile per hour zone and that, when he was "even with the road grader," Provencher's "car came out from behind the road grader and [he] hit him." Martin testified that he did not have time to avoid the collision and, further, when asked if he could have passed on the outside of the vehicle without going into the ditch, stated that "[i]t would have been awfully close."
Martin and Darson testified that, after the accident, they began to experience pain. In particular, Darson testified that he hit his knee on the dashboard and his head on the windshield. Trial testimony indicates that Al Landry, a trooper with the Louisiana State Police, responded to the call and that help was requested from Acadian Ambulance. When the emergency personnel arrived, Martin and Darson were taken from the vehicles and transported to Our Lady of Lourdes Hospital in Lafayette, Louisiana.
While at the hospital, Martin and Darson complained of various problems allegedly stemming from the accident. Darson testified that emergency room personnel refused to treat him because he had no proof of insurance coverage and that he left the hospital accompanied by Martin, who became upset due to the denial of treatment. The record indicates that both Martin and Darson sought further medical treatment for their complaints in the days following the accident.
As a result of the June 1994 accident, Martin and his wife, Cynthia Martin, filed suit against Provencher as well as his automobile insurer, Allstate Insurance Company, alleging that the accident was caused solely by Provencher's negligence. Martin sought damages for both past and future medical expenses and past and future physical pain and suffering. Mrs. Martin sought compensation for property damage, because the car in which Martin was traveling belonged to her, and loss of consortium.
Provencher answered the petition denying the allegations of negligence and, further, asserting that the accident resulted from the negligence of Martin and Harrison, the operator of the J.B. Talley road grader. Due to this alleged negligence, Provencher brought a reconventional demand against Martin and a Third-Party Demand against Martin's insurance provider, Safeway Insurance Company, Harrison, and J.B. Talley Construction Company. This third-party demand was subsequently amended to include Audubon Indemnity Insurance Company, J.B. Talley's insurer.
Furthermore, Darson filed a separate petition seeking recovery for his alleged injuries. Made defendant in this suit were Martin and his automobile insurer, Safeway Insurance Company, and Provencher and his insurer, Allstate. Darson additionally named J.B. Talley and Harrison as defendants. In his petition, he alleged that, as a result of the accident, he "sustained an injury to his head, neck, back, and acute fracture of [his] right knee." Darson sought medical expenses, past and future lost wages, and damages for pain and suffering.
*977 As in the suit filed by Martin, Allstate and Provencher answered the petition denying negligence on Provencher's part. Martin and Safeway answered and brought a crossclaim against Provencher, Harrison, J.B. Talley, and their insurers. Harrison, J.B. Talley, and Audubon then filed a cross-claim against Provencher, Martin, and their insurers.
The record indicates that the two cases were consolidated and proceeded to trial.[1] Although heard at the same time, Darson's suit was decided by a jury while the Martins' matter was decided by the trial judge.[2] In both matters, judgment was entered in favor of the defendants. In Martin's case, the trial judge assigned one hundred percent of the fault to him. While, in Darson's case, the jury responded "No" to combined interrogatories which asked whether Martin, Provencher, J.B. Talley, and Wesley Harrison were negligent in the accident and, if so, was that negligence the cause of Darson's alleged injuries.
The plaintiffs in both suits now appeal. Although not addressed in formal assignments of error, Mr. and Mrs. Martin argue that the trial judge was manifestly erroneous in finding that Mr. Martin was one hundred percent at fault for the accident. They maintain that this finding is inconsistent with the jury's determination in Darson's case.
Darson also appeals asserting that the jury's response to the interrogatory clearly indicated that they did not find a causal connection between his injuries and the accident and that this finding was in error. Further, Darson argues that the trial court abused its discretion by denying a Motion to Continue which was filed so that one of his treating physicians might testify.

Discussion

Verdicts
As each of the plaintiffs argue that the verdict received in their respective cases should be viewed in light of the judgment rendered in the companion case, we will address these verdicts collectively before particularizing our discussion to each of the plaintiffs' assignments.
In the Martins' case, the trial judge expressed, in part, the following in oral reasons for ruling:
The Court was very impressed by the testimony of Wesley Harrison and Michael Provencher and finds their testimony to be credible and believable and finds that the cause of the accident was the negligence and fault of the defendant, Joseph T. Martin, in running into the stopped car of Michael Provencher.
The Court finds as a matter of fact that Mr. Provencher, in attempting to pass the motor grader, was stopped in the roadway in sufficient time for Mr. Martin to see and stop, and failing that, to go around. The Court finds as a matter of fact that there was sufficient room for Joseph Martin to go around the stopped Provencher vehicle. The Court further finds that Mr. Wesley Harrison was doing what he was supposed to be doing, that the roadway was under construction, that the lack of signs was not a contributing cause to the accident since Mr. Martin had passed the identical spot in the roadway earlier in the day and was well aware that the roadway was under construction, and was well aware of the width of the roadway and that which it would take to safely traverse the roadway.
A big issue was made about dust and impaired visibility in the case. The Court finds that that is a red herring issue. If there was dust or impaired visibility, the duty on the part of Mr. Martin would have been heightened to slow his vehicle. He, of all people, knew or should have known of the dust or impaired visibility since he had been driving this roadway only an hour or so before this collision. So if there was dust that would have impaired his vision, he had all the more reason to slow down significantly or stop even before entering the area of construction.
In short, the Court feels that Mr. Martin has failed to prove his case by a preponderance of the evidence and finds that one hundred percent (100%) of the fault of the collision in this case is attributable to the plaintiff, Joseph T. Martin, and will issue a *978 judgment consistent with these rulings dismissing Mr. Martin's case with prejudice at his costs.
Thus, the trial judge found Martin at fault for the accident and never reached the issue of causation or medical expenses for Martin's alleged injuries.
In Darson's case which, as previously stated, was decided by a jury, the following was indicated on the verdict form:
QUESTION NO. 1:
Do you find that the defendant, Joseph T. Martin, was negligent, and if so, was that negligence a cause of injury to the plaintiff, Raymond Darson?
 YES ______ NO X 
QUESTION NO. 2:
Do you find that the defendant, Michael Provencher, was
negligent, and if so, was that negligence the cause of
injury to the plaintiff, Raymond Darson?
 YES ______ NO X 
QUESTION NO. 3:
Do you find that the defendants, J.B. Talley & Co., Inc.,
and its employee, Wesley Harrison, were negligent, and if
so, was that negligence a cause of injury to the plaintiff,
Raymond Darson?
 YES ______ NO X 
QUESTION NO. 4:
Please determine the percentages of negligence, if any,
assessed to the defendants, Joseph T. Martin, Michael
Provencher, and J.B. Talley & Co., Inc., and its employee,
Wesley Harrison.
Joseph T. Martin 0 %
Michael Provencher 0 %
J.B. Talley & Co., Inc./Wesley Harrison 0 %
 TOTAL 0 %
PLEASE NOTE THAT YOUR PERCENTAGES MUST
TOTAL 100%.
QUESTION NO. 5:
What amount damage, if any, do you award to the plaintiff,
Raymond Darson?
GENERAL DAMAGES
(Including physical and mental pain, both
past and future, disability, and loss of
enjoyment of life.) $ 0 
SPECIAL DAMAGES
(Including medical expenses, both past
and future) $ 0 
Thus, from the verdict form, the jury could have determined either that Darson failed to prove, by a preponderance of the evidence, that any of the drivers were negligent or that, even if negligence was proven, that he failed to prove that his injuries were causally connected to the accident. After answering "No" to the first three questions, the jury was not required to assign the percentage of fault. This was explained to the jury by the judge after a question was submitted during deliberations. The judge explained as follows regarding the combined form of the interrogatories:
So you can find negligence, a deviation from the standard of care. And if so, was that negligence a cause of the injury to go to the plaintiff, Raymond Darson? You can find that the defendant was negligent but he didn't cause any injuries to go to Raymond Darson by that auto accident, by that negligence. So you can say "no" to go to all three and that is the end of it. Or, you can say "yes" he was injured. Then you discern the percentages of fault and the amounts of damages.
Despite this instruction, the jury answered "No" to the first three questions and then completed the remainder of the form. Whether the assignment of 0% negligence to each of the defendants has any significance, we are unable to tell. However, our review of the record indicates that both a finding that Darson did not prove that any of the defendants were negligent and the alternative finding that he did not prove a causal connection between his injuries and the accident are clearly supported. Thus, for reasons stated below, and in light of our standard of review, we do not find the two verdicts necessarily inconsistent and will, accordingly, review each independent of the other.

The Martins' Assignment
The Martins argue that the trial judge was manifestly erroneous in finding Mr. Martin 100% at fault for the accident, particularly in light of the jury's assignment of 0% liability for his negligence. They assert *979 that the physical evidence and testimony presented at trial indicate that Provencher was at fault for going around the road grader and, thereby, traveling in the lane of traffic reserved for Martin. Furthermore, the Martins contend that Harrison, from atop his road grader, negligently waived Provencher around the machinery and that J.B. Talley was negligent in failing to use proper signage or flagmen in the construction area. The Martins also assert that the error in the trial court's ruling is apparent by his statement that he found both Harrison and Provencher credible when the two witnesses related inconsistent versions of events as to whether Harrison indicated that it was safe for Provencher to pass.
The above-related excerpt from the trial judge's oral reasons for ruling indicate that the trial judge found that Martin was at fault in not avoiding the accident. In making that determination, he also gave the following reasons for ruling regarding his finding that Martin's version of events was not credible:
So the Court listened carefully to the testimony of Joseph Martin and Raymond Darson and finds that neither witness has any credibility to speak of. The Court was impressed with the testimony of the emergency room physician at Our Lady of Lourdes Hospital, whose name escapes me at this time
BY [COUNSEL FOR MR. PROVENCHER]:
Dr. Scott Thompson.
BY THE COURT:
Dr. Scott Thompson, who made an excellent witness. The Court adopts his testimony and finds it to be credible and believable. This doctor more or less corroborates the Court's feeling that Joseph T. Martin does not have any credibility or believability as a witness because of the outrageous conduct at Our Lady of Lourdes Hospital in reporting or misreporting his symptoms.
It is apparent from the trial judge's reasons for ruling that he relied heavily on credibility determinations in concluding that Martin could have avoided the accident and, further, in concluding that the remaining defendants acted reasonably. In reviewing factual findings and credibility determinations, as we are called to do here, an appellate court must be mindful of the following:
It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable... Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong....
When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said.... Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination.... But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.
Rosell v. ESCO, 549 So.2d 840, 844-45 (La. 1989) (citations omitted). After reviewing the record under the above-described standard, we find no manifest error in the trial judge's credibility determinations nor in his factual determinations.
As stated in our discussion of the factual background in this case, Martin testified that he did not see Provencher's car until he was beside the road grader and, further, that he did not have time to avoid the accident. He also stated that it would have been "close" *980 when asked whether he could have gone around Provencher without going into the ditch. Provencher testified, however, that he believed that Martin would have had sufficient room to go around him and, further, that he believed that, like him, Martin had time to stop his vehicle before the accident. Harrison too opined that the road was wide enough to accommodate both vehicles. He stated that: "He wouldn't have to go off the shoulder. There was plenty enough width on that side." Despite Provencher and Harrison's differing testimony as to whether Provencher was waved around the road grader, the two witnesses were consistent on this point of testimony and, in the trial court's opinion, offered credible accounts.
Further, although not mentioned in the trial court's reasons for ruling, J.B. Talley presented the testimony of Francis Wyble, an expert in accident reconstruction, traffic engineering, and highway construction. Mr. Wyble testified to, among other things, the width of the roadway. He opined that, at the time of the accident, the width of the road was approximately forty-three to forty-four feet and that considering the width of the two cars and the road grader, the three vehicles should have been able to pass on the roadway. He also testified regarding the driver's line of sight prior to the accident and opined that the drivers of the vehicles should have been able to have seen each other as far away as five hundred feet, despite the obstruction of the road grader. Thus, in light of the testimony regarding the width of the road and Martin's ability to pass or stop, we find no error in the trial court's determination that Martin could have avoided the accident.
Neither do we find error in the trial court's reliance on the testimony of Dr. Scott Thompson, the emergency room physician who treated both Darson and Martin at Our Lady of Lourdes Hospital. Dr. Thompson's testimony related to the men's allegedly belligerent behavior in the emergency room and their requests for narcotics, which Dr. Thompson did not think appropriate for their particular medical findings. Although discussed by the trial judge and relied upon for his credibility determination of Martin, much of Dr. Thompson's testimony related to the connexity of the accident and Martin's alleged injuries. As we find no error in the trial judge's determination that the defendants were not at fault in causing the accident, and, therefore, not liable for any damages, we need not discuss whether the accident caused the alleged injuries.
Additionally, we conclude that the record supports the trial court's determination that J.B. Talley was not negligent for inadequate signage or lack of flagmen in the immediate area. The following exchange between Mr. Wyble and J.B. Talley's attorney occurred at trial:
Q. Does that mean that when two people are going down a rural road that is under construction on a dirt road and they are coming into a curve and there is a motor grader grading the curve, are they to regulate themselves as to how to pass this motor grader?
A. Well, yes, sir. If you only have two cars, you know, what is the definition of traffic? When we think of self-regulating, two people getting there at the same time is no big deal, particularly if they know that it is a construction zone, they can see the motor patrol, there is nothing hidden there. It is obvious. So all it is is one of them needs to be a little courteous and let the other one go by or they may agree that they can both cross whatever it is at the same time. But they can definitely do it safely and effectively with no harm to anybody.
Q. It is not incumbent upon the State through the Department of Highways or its contractor to put out all kinds of flaggers or signs and cones where a motor grader is operating in 400 or 500 feet stretch of highway in your opinion?
A. As long as they will fit the self-regulation. The answer to that question is: No, sir, it is not incumbent. As a matter of fact, you are better off not doing it.
In light of the above-discussed testimony as well as photographs of the accident scene which were entered into evidence, we conclude that the trial court was not manifestly erroneous in finding Joseph T. Martin to be 100% at fault in causing the accident at issue.

*981 Raymond Darson's Assignments
In his first assignment of error, Darson asserts that the jury's response to the verdict form, coupled with the trial judge's finding that Martin was liable for the accident can only be interpreted to mean that the jury found that Darson had failed to prove a causal connection between the accident and his injuries. Darson argues that the weight of the evidence indicates that, in fact, he suffered both back and knee injuries. Even were we to conclude that the jury found that one of the parties was proven to be negligent by a preponderance of the evidence, which we do not, we find no error in the determination that Darson failed to prove that his alleged injuries resulted from the accident.
In a personal injury action, a plaintiff has the burden of proving, by a preponderance of the evidence, that the alleged injuries were sustained and, further, that the injuries complained of were caused by the accident at issue. Revel v. Snow, 95-462 (La.App. 3 Cir. 11/2/95); 664 So.2d 655, writ denied, 95-2820 (La.2/2/96); 666 So.2d 1084. "Since the existence of injuries and causation of those injuries are factual determinations, the trier of fact's resolution of these issues is normally reviewed under the manifest error standard of review." Id. at p. 6; 664 So.2d at 659 citing Ponder v. Groendyke Transp., Inc., 454 So.2d 823 (La.App. 3 Cir.), writs denied, 457 So.2d 1195, 1198 (La.1984).
Darson testified that, at the time of the accident, his left knee hit the dashboard of Martin's car and that he hit his head on the windshield. He further explained that, when his head hit the dashboard, he became frightened because he heard a "pop" in his neck. He affirmed that there was evidence on the windshield and dashboard that he had struck them. Darson also stated that following the accident, his left knee began to swell, and that, when the paramedics arrived, he was secured on a board and taken to the hospital.
Darson testified that, once at the hospital, he gave his medical history to the emergency room personnel, instructed that he was under a doctor's care, and informed them that he was on medication. He also testified that an x-ray was taken of his knee while at the hospital. Darson finally testified that he did not receive further treatment at the hospital because he did not have proof of insurance.
As previously stated, the version of events at the hospital related by Dr. Thompson differed significantly from that offered by Darson. Dr. Thompson testified from his report of the examination and stated that Darson complained of neck, back, shoulder, and knee pain. The report, which was entered into evidence, indicates that Dr. Thompson recorded the following history:
Mr. Darson says he was a belted passenger in an automobile at a road construction site where another car hit them head-on. He says he cracked the windshield with his head. The report I have from Acadian Ambulance is that there is no windshield crack. The white shirt Acadian attendant called a second unit that was at the scene to confirm this and the second unit attendant also confirms that there was no windshield crack. Mr. Darson describes this as a major accident. Both Acadian attendants say this was a "very minor accident." Mr. Darson says there was no loss of consciousness and did not get out of the car after the accident.
Dr. Thompson confirmed that Darson informed him that he had undergone a previous shoulder surgery, that he had prior chronic neck and back complaints and, further, that he was on Anexsia, a narcotic, and Soma, a muscle relaxant. Dr. Thompson's report details that the following, in part, was found on examination:
Mr. Darson goes to great length to describe the pain he is in. Palpatation of his head doesn't show any trauma. There is no hemotypanum. He has appropriate C-spine head and long board restraint. His T-spine collar was loosen[ed] and his neck was palpated. He has no step-off deformity, no spasm. He describes pain at the high end of the C-spine. The collar was replaced. Head restraint was replaced and exam continued. His shoulder showed some left sided surgical change, but he has adequate sensation to light tough and equal hand grasps bilaterally. *982 There is no marks of atrophy. He has full range of motion both shoulders. There is no marks on his chest including no evidence of a shoulder strap. His breath sounds are full. His heart is a regular rhythm and rate. Abdomen is soft. There is no lap belt marks across the bony pelvis or the midline. He has intact hip joints. He has great complaints of pain with marked tightening in his legs with less than 10 degrees of elevation on both sides. I repeated this twice and he tenses up with the least amount of lifting. He has equal leg strength by toe testing. He has equal sensation in both legs. C-spine and Lspine films are reviewed. I don't see any significant bony or disc abnormality.

IMPRESSION: 1. COMPLAINTS OF PAIN OUT OF PROPORTION TO HIS PHYSICAL FINDINGS.

2. COMPLAINTS OF DAMAGE TO THE CAR INCONSISTENT WITH THE PHYSICAL FACTS AT THE SCENE.
In addition to Dr. Thompson's testimony indicating that Darson's complaints exceeded the physical findings, the jury was also faced with the formidable task of sifting through Darson's lengthy medical history to determine whether the injuries now complained of were, in fact, caused by the accident at issue. The record indicates that Darson had previously suffered numerous injuries, many work-related, and had, in fact, undergone shoulder surgery and had previously reported lower back pain. Additionally, Darson testified that he had fallen in a convenience store in 1987 and reported to the hospital with both low back and left knee pain.
Darson presented medical testimony indicating that the injuries of which he now complains were caused by the June 1994 automobile accident. First, Dr. Kenneth Vogel, a neurosurgeon, testified that he first saw Darson in February 1995, and that, at that time, Darson complained of low back and left leg pain as well as cervical and bilateral arm pain. Dr. Vogel stated that, during this initial examination, he found a moderate degree of muscle spasm in both the cervical and lumbosacral regions. Prior to Darson's next visit, Dr. Vogel examined a lumbosacral MRI which had been performed in January 1995, and found that the test revealed a "modic type 2A central bulge at L5-S1." He further opined that Darson's complaints were consistent with this type of injury and that further testing would be necessary to determine if surgery would be required.
Darson also presented Dr. Lloyd Boulet, a family practitioner, who examined him a few days after the accident. Dr. Boulet testified that Darson complained of neck and upper and lower back pain. Upon examination, he detected muscle spasm in the lumbar area and provided Darson with an injection to relieve the spasm. He further opined that Darson had sustained a fractured left knee.
With regard to this alleged disc problem, the defendants presented Dr. Thomas Flynn, a neurosurgeon, who examined Darson and found that Darson did, indeed suffer from a broad-base bulge at L5-S1. However, he opined that this is a very common condition and one that "does not cause nerve root compression nor should it cause clinically significant pain." He stated that "it is a very common early sign of degenerative change which occurs in everybody with aging." Dr. Flynn also stated that his examination revealed no muscle spasm and that he found signs of malingering and symptom magnification.
Additionally, Darson was questioned with regards to his extensive medical history. Darson's medical records, which were admitted into evidence, indicate that over the past several years, Darson had repeatedly reported to the hospital complaining of lower back pain. He also stated during cross-examination that he had injured his left knee when, as a teenager, he ran into a parked car and further affirmed that he reported to the emergency room in 1987 complaining of left knee pain after falling in a convenience store.
In light of Darson's substantial medical history, along with the testimonies of Dr. Thompson and Dr. Flynn, we find no manifest error in a finding that Darson failed to prove, by a preponderance of the evidence, either injury or causation. Accordingly, this assignment is without merit.
*983 In his final assignment of error, Darson contends that the trial judge incorrectly denied a Motion to Continue which he asserts was necessary as he had been informed that two of his treating physicians would be unavailable for trial.
The record indicates witness subpoenas were issued on February 19, 1997 for the trial on this matter which was scheduled to begin on March 10. On February 21, Dr. Deshotels, the only physician who did not ultimately appear at trial, informed Darson that he would be unavailable and would not honor the subpoena. The trial court denied the Motion to Continue finding a lack of due diligence on the part of the plaintiff to secure Dr. Deshotels' testimony. Subsequent to this denial, Darson applied for a supervisory writ from this court. This application was denied by a panel of this court on March 11, 1997, using the following language:
WRIT DENIED: There is no abuse of discretion in the ruling of the trial court.
As this court has previously addressed this matter, we conclude that our earlier decision is the "law of the case" on this issue. In discussing the law of the case doctrine in Hawthorne v. Hawthorne, 96-89 (La.App. 3 Cir. 5/22/96); 676 So.2d 619, writ denied, 96-1650 (La.10/25/96); 681 So.2d 365, this court approvingly quoted the following language:
It has been held that this principle applies to all decisions of an appellate court and not merely those arising from the full appeal process, (citations omitted.)
One of the reasons for application of the "law of the case" rule is to avoid indefinite relitigation of the same issue, (citations omitted.)
The "law of the case" doctrine should not be applied where to do so would accomplish an obvious injustice, or where the former appellate decision was clearly, palpably or manifestly erroneous. [Citation omitted.]
Id. at p. 24; 676 So.2d at 631 quoting First Fed. Sav. & Loan v. Disiere, 542 So.2d 11 (La.App. 4 Cir.), writ denied, 548 So.2d 311 (La.1989). As we conclude that our denial of Darson's writ application was neither manifestly erroneous nor leading to an obvious injustice, we find this assignment meritless.

DECREE
For the foregoing reasons, the decisions of the lower court are affirmed. All costs of this proceeding are assigned to the plaintiffs, Joseph and Cynthia Martin.
AFFIRMED.
NOTES
[1] See Darson v. Provencher, 97-1649 (La.App. 3 Cir. 05/06/98); 718 So.2d 983.
[2] Martin stipulated that his damages were less than $50,000.00. See La.Code Civ.P. art. 1732.