JjCOOKS, J.
This is a suit for personal injury damages arising out of a September 23, 1995 accident wherein a vehicle being driven by Timothy Kerrigan (Kerrigan) struck Terri 12Legere’ (Ms. Legere’) as she exited her vehicle on Ambassador Caffery Parkway in Lafayette, Louisiana. At the time of the accident, Kerrigan was operating a Chevrolet S-10 pickup truck owned by his employer, Kevin M. Fitch, d/b/a Lafayette Auto Salvage (Fitch), and was in the course and scope of his employment with Fitch. Additionally, Geneva Assurance Syndicate (Geneva Assurance) had a policy of liability insurance in full force and effect on the Chevrolet S-10 vehicle at the time of the accident. After the trial on the merits, the trial court issued written reasons for judgment concluding that Ms. Legere’ suffered $117,247.19 in general and special damages but found that she was eighty percent at fault in causing the accident. The trial court attributed the remaining twenty percent to Kerrigan. The effect of this division of fault reduced Ms. Legere’s recovery to $23,449.43. The trial court then signed a judgment in favor of Ms. Legere’ and against Geneva Assurance, Fitch, and Kerrigan in the amount of $23,449.43. Ms. Legere’ has appealed asserting two assignments of error. For the following reasons, we affirm the trial court’s judgment in part and reverse in part.
At the location of this accident, Ambassador Caffery Parkway is a five-lane paved highway running generally north and south with the middle lane serving as a turning lane. In the early afternoon of September 23, 1995, Ms. Legere’ was in the process of moving from an apartment in Lafayette to a new residence. While traveling north on Ambassador Caffery Parkway and following a pickup truck carrying some of her household goods, she observed a box of kitchen utensils fall from the truck and scatter across both northbound lanes of the highway.
Ms. Legere’ immediately turned her vehicle around and drove back to clear the debris from the highway. She stopped her vehicle in the turning lane at a point adjacent to the scattered kitchen utensils and engaged her emergency flashing lights. Christy Buck, a fourteen-year-old passenger, exited the Legere’ vehicle on the | ¡¡passenger side, went around the rear of the vehicle, and stepped into the northbound traffic lanes of the Ambassador Caf-fery Parkway. As she entered the highway, Ms. Buck held her hand up long enough to stop the oncoming traffic and after the traffic had stopped, began kicking items from the inside northbound lane to the outside lane. Once she had cleared the inside lane, Ms. Buck began picking up the scattered utensils in the outside lane. Traffic began moving in the inside lane but remained stalled in the outside lane as she gathered the debris.
Ms. Legere’ remembers little about the accident. She initially did not exit her vehicle to assist Ms. Buck, because the vehicle was also occupied by Ms. Buck’s Godchild.[1] As she observed Ms. Buck attempting to clear the highway, she decided *71 to help. As she exited her vehicle and entered the northbound inside lane of Ambassador Caffery Parkway, Ms. Legere’ was struck by Kerrigan’s vehicle. When asked if she looked to see if it was safe to exit her vehicle, she did not answer the question directly but stated that, “There was no traffic in the lane closest to me.” Ms. Legere’ testified that she recalled opening the driver-side door, placing her feet on the ground, and closing the door. Thereafter, her next clear memory is of being in the hospital after the accident.
As Ms. Buck’s cleanup activity was beginning, Kerrigan was approaching the stalled traffic from the south. He testified that he was on his way back to his employer’s place of business, having been on an errand for Fitch. According to Kerrigan, the traffic was heavy on Ambassador Caf-fery Parkway that afternoon, and as he approached the stalled traffic, he initially slowed to approximately twenty-five to thirty miles per hour. He observed Ms. Legere’s vehicle facing him in the turning |4lane when he was approximately one hundred feet from it, but observed no occupant. Additionally, he testified that he did not initially see Ms. Buck as she was attempting to clear the lanes.[2] Kerrigan testified that he was in the inside lane, that he had “a few” vehicles in front of him, and that he was moving with the flow of traffic.
As Kerrigan approached the Legere’ vehicle, he observed that none of the vehicles in front of him gave any indication of danger and that no one was directing traffic. His vehicle was approximately two to three feet inside the yellow line separating the turning lane from the inside northbound lane, and he observed that the Leg-ere’ vehicle was only one to two feet on the other side of the yellow line. He testified he saw Ms. Legere’ only a split-second before impact. After the initial impact, she flew up onto his hood and windshield and ultimately came to rest in the roadway in front of his vehicle.
In addition to the testimony of Ms. Leg-ere’ and Kerrigan, two eyewitnesses to the accident testified. Chad Bourque testified on behalf of Ms. Legere’, and his wife, Shannon Riley Bourque, testified on behalf of the defendants. Chad Bourque testified his vehicle was stopped in the north-bound outside lane of Ambassador Caffery Parkway, waiting for Ms. Buck to clear the lane. When he first stopped, the kitchen utensils cluttered both lanes. He observed Ms. Buck exit the Legere’ vehicle and kick the utensils from the inside to the outside lane, thereby clearing the inside lane for traffic to proceed. He stopped behind one or two other vehicles and directly across from the Legere’ vehicle. He confirmed Kerrigan’s testimony that there was only a foot between the yellow line separating the north-bound inside lane and Ms. Legere’s vehicle. According to Bourque, Ms. Leg-ere’ did not check the traffic but [fi“[m]ore or less jumped out the car and took off running across the road.” He then heard Kerrigan’s brakes lock up and saw Ms. Legere’ “flying through the air.” Bourque estimated Kerrigan’s speed to be thirty to thirty-five miles per hour. After the accident, he observed that Kerrigan was very upset and kept saying “I didn’t see her.”
As a passenger in her husband’s automobile, Mrs. Bourque also observed the accident. She testified when Ms. Legere’ exited her vehicle, she did not check the traffic but “just stepped out and ran.” Mrs. Bourque’s initial reaction to her husband was “[S]he’s going to get hit.” It was Mrs. Bourque’s observation that the Kerrigan vehicle had just started to accelerate at the time of impact, but she did not think he was going very fast.'
The initial suit in this litigation was filed by Kerrigan against Ms. Legere’ and her liability insurer, Imperial Fire and Casualty Insurance Company (Imperial Fire); and against Bryan Broussard, the driver of the truck from which the box of kitchen *72 utensils fell, and his liability insurer, State Farm Mutual Automobile Insurance Company (State Farm). In his suit, Kerrigan sought to recover for mental anguish and emotional distress he claims to have suffered as a result of the accident. All of the defendants timely answered this suit, and Imperial Fire additionally filed a cross-claim against Broussard and State Farm. Ms. Legere’ subsequently filed a suit against Kerrigan, Fitch, and Geneva Assurance[3] to recover for her injuries. These suits were consolidated for trial. Thereafter, various dismissals resulted in a reduction of the litigation to Ms. Legere’s claim against Kerrigan, Fitch, and Geneva Assurance.
In the appeal of the judgment rendered in her favor, Ms. Legere’ asserts two | (¡assignments of error. One relates to the trial court’s determination of fault, and the other relates to the trial court’s determination of the extent of injuries suffered by Ms. Legere’.
Assignment of Error No. 1
In her first assignment of error, Ms. Legere’ asserts “[i]t was error for the trial court to find that a motorist who admittedly failed to maintain a proper lookout and accelerated into what constituted an emergency situation was only guilty of 20 percent of the fault.”
The trial court was presented with conflicting testimony concerning Ms. Leg-ere’s actions. She asserts she exited her vehicle and entered the north-bound lane only after visually assuring herself the lane was clear. This assertion is in conflict with the testimony of Kerrigan as well as that of Mr. and Mrs. Bourque, two disinterested eyewitnesses. These three individuals all testified when Ms. Legere’ exited her vehicle, she ran into the inside lane without even looking to determine if the inside land was clear. Ms. Bourque testified-she did not believe Kerrigan was driving in an unsafe manner and felt he could not have done anything to avoid the accident. It is obvious from the trial court’s decision that it accepted the testimony of Kerrigan and the Bourques on the question of whether Ms. Legere’ attempted to ascertain whether the way was clear before she entered the highway. The court further found Kerrigan was traveling at thirty to thirty-five miles per hour, an excessive speed given the circumstances. An appellate court should not disturb the factual findings of the trier of fact absent manifest error. Rosell v. ESCO, 549 So.2d 840 (La.1989). We find no manifest error in these findings of fact.
In considering the issue of the respective fault of Ms. Legere’ and Kerri-gan, various factors may influence the degree of fault assigned, including (1) whether the |7conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor, whether superior or inferior; and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. Watson v. State Farm Fire & Cas. Ins. Co., 469 So.2d 967 (La.1985). Only after an appellate court finds a clearly wrong apportionment of fault may it adjust the award but then only to the extent of lowering or raising it to the highest or lowest point respectively which is reasonable within the trial court’s discretion. Clement v. Frey, 95-1119, 95-1163 (La.1/16/96); 666 So.2d 607.
Ms. Legere’ relies on our holding in Uriegas v. Gainsco, 94-1400 (La.App. 3 Cir. 9/13/95); 663 So.2d 162, writ denied, 95-2485 (La.12/15/95), 664 So.2d 458 as authority for her argument that the trial court erred in assessing fault. While we do not find the decision favors Ms. Legere’s position, we do agree it contains *73 an excellent analysis of the law concerning motorist/pedestrian accidents.
Louisiana law does not impose absolute or strict liability upon a motorist involved in a collision with a pedestrian. Aetna Cas. & Sur. Co. v. Nero, 425 So.2d 730 (La.1983). Motorists are not the insurers of pedestrians’ safety. Puearry v. Department of Pub. Safety, 496 So.2d 1372 (La.App. 3 Cir.1986). However, a motorist is statutorily obligated to exercise due care to avoid colliding with any pedestrian upon the roadway and must give warning to the pedestrian by sounding the horn when necessary. Furthermore, a motorist must exercise proper precaution upon observing any child or any confused or incapacitated person upon a highway. La.R.S. 32:214.
The fact that an accident occurs does not create a presumption of negligence in favor of either the pedestrian or motorist. Accidents occurring between a pedestrian and a motorist are .governed by the principles of comparative fault. La.Civ.Code art. 2323; Turner v. New Orleans Pub. Serv. Inc., 476 So.2d 800, 803 (La.1985). Therefore, a determination of negligence in motorist/pedestrian accidents rests upon the particular facts and circumstances of each case. See Myles v. Turner, 24,198 (La.App. 2 Cir. 1/19/94); 632 So.2d 384.
The driver of a vehicle bears a greater responsibility to avoid pedestrian/motorist accidents because the consequences of his fault present the potential for causing the greater havoc. Turner, supra. “The greater the risk of harm to others, the greater is the fault.” Id. at 805. As |Rstated by the Louisiana Supreme Court in Baumgartner v. State Farm Mut. Auto. Ins. Co., 356 So.2d 400, 406 (La.1978):
The operator of a motor vehicle, a dangerous instrumentality, has the constant duty to watch out for the possible negligent acts of pedestrians and avoid injuring them. A higher standard of care than that required of pedestrians is imposed upon the motorist commensurate with the hazards his conduct inflicts upon the public safety- It must be noted, however, that a motorist who exercises all reasonable care to protect a pedestrian, who nonetheless suffers injury, is not at fault.
Likewise, a pedestrian is charged with a duty to exercise reasonable care when entering the roadway or a crosswalk. Miller v. Bailey, 621 So.2d 1174 (La.App. 3 Cir.), writ denied, 629 So.2d 358 (La.1993). A pedestrian simply may not freely choose to leave a position of safety and pursue a course certain to enter the path of a vehicle which is so' close that it is impossible for the driver to yield. La.R.S. 32:212(B). Furthermore, when a pedestrian crosses a roadway at any point other than within a marked cross walk or within an unmarked cross walk at an intersection, the pedestrian must yield the right of way to all vehicles upon the roadway. La.R.S. 32:213(A). Therefore, responsibility for travel free from undue peril on the streets and highways of this state is shared by both the motorist and pedestrian. The countervailing duties that motorists and pedestrians owe to each other ensure that both pedestrians and motorists may safely coexist on roadways traversed'by both.
Although a motorist commands a greater instrumentality of harm, a pedestrian still bears the burden of proving that the motorist was negligent before he can recover damages. Puearry, 496 So.2d at 1374; Bennett v. State, Through DOTD, 503 So.2d 1022 (La.App. 2 Cir.), writ denied, 505 So.2d 58 (La.1987); McKenzie v. NOPSI, 455 So.2d 678 (La.App. 4 th Cir.), writ denied, 460 So.2d 1043 (La.1984). A motorist has no special duty to anticipate the presence of a pedestrian in a roadway where there is no crosswalk. Shroyer v. Grush, 555 So.2d 534 (La. *74 App. 4 Cir.1989); writs denied, 559 So.2d 139, 140 (La.1990); Osby v. Harris, 375 So.2d 181 (La.App. 2 Cir.1979). Moreover, a motorist is not held to the highest standard of care in guarding against unexpected or unusual obstructions in the road. Calais v. Thibodeaux, 220 So.2d 209 (La.App. 3 Cir.), writ denied, 254 So.2d La. 15, 222 So.2d 67 (1969). A motorist has a right to assume that a pedestrian will remain in a position of safety and will not attempt to enter the path of a moving vehicle. Puearry, 496 So.2d at 1374. However, a motorist may not blindly rely upon this assumption when he sees, should have seen, or anticipates that the pedestrian is going to cross the path of his vehicle. Henry v. Svebek, 339 So.2d 895 (La.App. 3 Cir.1976), writ refused, 341 So.2d 1127 (La.1977). When a motorist sees, should have seen, or anticipates that the pedestrian is going to cross the path of his vehicle, the motorist must exercise reasonable care to protect the pedestrian. Baumgartner, 356 So.2d at 407.
£2Id. at 171-172.
Considering these concepts and applying the factors as suggested by Watson, 469 So.2d 967, we find no error in the trial court’s apportionment of fault. Therefore, we find no merit in Ms. Legere’s first assignment of error.
Assignment of Error No. 2
Ms. Legere’s second assignment of error states “[t]he trial court erred in ignoring the uncontradicted written testimony of the treating physician that the plaintiff suffered a herniated lumbar disc and required surgery in assessing damages suffered by [her].” However, the real basis of this assignment is Ms. Leg-ere’s complaint that the trial court awarded inadequate general damages.
In its written reasons for judgment, the trial court summarized the medical evidence concerning the various injuries sustained by Ms. Legere’. It then categorized the damage award as follows:
(1) Facial Injury, Scarring, Disfigurement, Pain and Suffering General Damages — Past, present and future: $50,000.00
Future Medicals: $21,000.00
(2) Lumbai* and Cervical Injuries General Damages — Past, present and future: $25,000.00
(3) Leg Fracture, Knee Abrasions and Contusions General Damages — Past, present and future: $15,000.00
(4) Past Medical: $ 5,047.19
(5) Lost Wages: $ 1,200.00
Ms. Legere’ only complains of the award for the lumbar and cervical injuries.
The written reasons for judgment suggest the following findings concerning these injuries:
Legere’ also sustained injury to her neck and back. Dr. Clifton W. Shepherd diagnosed cervical strain which has resolved and lumbar strain which had not resolved through the date of trial. Legere’ also complains of bilateral calf pain. Dr. Shepherd indicates that Leg-ere’ more probably \ wthan not has a herniated disc at L4-5, worse on the right than the left. Dr. Shepherd further indicates that the approximate cost of future testing for Legere’ would be $3,569.00, the surgeon’s cost for performing a lumbar laminectomy and dis-cectomy would be $4,500.00 to $6,000.00 and the approximate hospital costs for that surgery would be approximately $11,000.00.
(Emphasis added.)
Despite Dr. Shepherd’s specific findings concerning a herniated disc at L4-5, the trial court concluded:
Due to the lack of diagnostic testing performed in connection with Legere’s lumbar injury, this Court is unable to find, by a preponderance of the evidence, that she suffered a herniated disc in connection with the subject incident. This Court will, therefore, award damages for Legere’s back injury based on a finding of a long-term lumbar strain....
Dr. Shepherd, a certified orthopaedic surgeon, did not testify. Rather, his medical reports were introduced in lieu of his testimony. These reports reflect that Dr. Shepherd first saw Ms. Legere’ on December 13, 1995, with complaints of numbness in her forehead, low back pain, bilateral *75 leg pain, headaches, right knee pain, right shoulder pain, and neck pain. Her principal complaint was of “central low back pain that radiated into both lower extremities to the level of the foot on the right and to the calf on the left.” After performing a very complete, orthopaedic examination, Dr. Shepherd concluded the following:
This lady has had serious injuries that include a concussion by history, a severe laceration to the left forehead region, a cervical strain, a lumbar strain, contusions and abrasions to the knees, and a straining type injury to the right shoulder. I do not know if she has internal derangement conditions of the knees. She appears to have a healing fracture of the left proximal fibula, near the knee.
Dr. Shepherd’s initial proposed treatment was medication and bed rest.
Ms. Legere’ returned to Dr. Shepherd on July 23, 1996 complaining of “a great deal of low back discomfort.” After examining Ms. Legere’, Dr. Shepherd recommended she return in four weeks for further evaluation and additional |n diagnostic studies. The follow-up visit occurred on August 20, 1996. At that time, Ms. Leg-ere’ related pain complaints above both calves to Dr. Shepherd. In his examination of Mr. Legere’s spine, Dr. Shepherd concluded she did have “a little bit of right paralumbar muscle spasm which [was] actively palpable ...” He continued her on pain medication and suggested she continue to use a back support.
Ms. Legere’s final visit to Dr. Shepherd occurred on August 6, 1998. Dr. Shepherd again performed an orthopaedic examination and found, she was suffering from “moderate spasm at the right lumbar muscles, and mild spasm at the left lumbar muscles.” Concerning his findings, Dr. Shepherd stated:
In regards to her back, her back pain has progressively gotten worse, and she clearly has developed a pattern of pain from the back, down both legs, into the calves, with right worse than the left. She sometimes has tingling or feelings that the calf falls asleep on the right side. On examination, her straight leg raising is consistent with a disc injury. She has what I would define as a contra-lateral straight leg raise on the left. When the left leg is raised, it causes right sciatic pain, and this is basically pathogomonic for a disc injury. She has decreased feeling in the right great toe area, which would localize the level to L4-5.
I understand that there are no funds to do diagnostic testing. If funds were available, I clearly would recommend an MRI, myelogram, and post-myleogram CT scan of her back. Without the benefit of the tests, it is more probably than not that she has a herniated disc at Lk-5, worse on the left than on the right. Her complaints and physical examination match this diagnosis extremely well.
(Emphasis added.)
There is no evidence to contradict the doctor’s positive clinical finding that Ms. Legere’ suffers from a herniated disc at L4-5. Even if we assume that the lack of diagnostic testing is “negative evidence” on this point, “[p]ositive evidence on a given point must.be given greater weight than negative testimony on the same point.” La.R.S. 15:440. This rule of law applies to medical evidence as well as ordinary evidence. See Alexander v. Leger, 423 So.2d 731 (La.App. 3 Cir.1982), writ denied, 430 So.2d 75 (La.1983).
 112rfo recover in a personal injury action, a plaintiff need only prove by a preponderance of the evidence “that the alleged injuries were sustained, and further, that the injuries complained of were caused by the accident at issue.” Martin v. Provencher, 97-1648 (La. 3 Cir. 5/6/98); 718 So.2d 975, 981, writ denied, 98-1414 (La.7/2/98); 724 So.2d 739. For an award of future medical expenses, the plaintiff must simply show that it is more probable than not that the expenses will be incurred, through medical testimony verify *76 ing the cost and necessity of future treatment. Miller v. Dupont, 97-267 (La. 3 Cir. 10/8/97); 702 So.2d 902, writ denied, 97-2837 (La.1/30/98); 709 So.2d 713, 714. The trial court erred in concluding Ms. Legere’ did not establish by a preponderance of the evidence that she sustained a herniated disc at the L4-5 level.
Because the validity of the trial court judgment is interdicted by error, we must perform an independent de novo review of the complete record and exercise our own discretion in fixing the appropriate general and special damage award for this injury. Boudreaux v. Farmer, 604 So.2d 641, 653 (La.App. 1 Cir.), writ denied, 605 So.2d 1373 (La.1992), citing Suhor v. Gusse, 388 So.2d 755 (La.1980).
In determining general damages, the particular facts and circumstances of each case control. Boudreaux, 604 at 654. The record clearly reveals that living with a herniated lumbar disc has been difficult for Ms. Legere’. After the accident, she began experiencing substantial spasms and pain in her lower back and calves, which were still present at the time of trial. A twenty-one-year old mother at the time of the accident, Ms. Legere’ is unable to care for and play with her two young children as she once did. Her condition has so restricted her physical activities that she is unable to perform usual household and yard work. Also, Ms. Legere’s injury has put a strain on her relationship with her boyfriend of four years. After working, her back 113pain is often so severe that she is unable to stand.
Louisiana jurisprudence presents a wide range of awards for herniated disc injuries. Ms. Legere’s condition can be distinguished from the highest awards in that there is no evidence of any nerve impingement, disability rating, inability to work or chronic pain syndrome. However, considering the great restrictions on her daily activities and the need for future surgery, we find that Ms. Legere’ is entitled to an increased general damage award for her lumbar and cervical injuries from $25,-000.00 to $175,000.00. With the amount reduced by 80% for her degree of fault, Ms. Legere’ shall receive $35,000.00 for these injuries.
Ms. Legere’s treating physician, Dr. Clifton W. Shepherd, verified in his report that she will need future treatment. He also testified as to the cost of the treatment for these injuries:
[T]he approximate cost of testing would be $3,569.00, consisting of a lumbar my-elogram and CT scan at $1,542.00, a cervical MRI at $976.00,and a lumbar MRI at $1,051.00. The surgeon’s cost for performing a lumbar laminectomy and disectomy would be $4,500.00 to $6,000.00 and the approximate hospital cost for that surgery would be in the range of $11,000.00.
Based on Dr. Shepard’s uncontradicted expert opinion as to the need and cost of future treatment, we award Ms. Legere’ $19,819.00 for future medical expenses in addition to the trial court’s $21,000.00 award. With this award also reduced by 80% for her degree of fault, Ms. Legere’ shall receive $8,163.80.
For the foregoing reasons, the disposition of the trial court is reversed in so far as it failed to find Ms. Legere’ sustained a herniated disc and will need future medical treatment for the condition. Accordingly, we amend the award of general damages for lumbar and cervical injuries to $175,-000.00 and award future medical expenses for the same in the amount of $40,819.00. In all other respects, the judgment is affirmed. All costs of this appeal are taxed against the defendants, Geneva Assurance 114Syndicate, Kevin M. Fitch, d/b/a Lafayette Auto Salvage, and Timothy Wayne Kerrigan.
REVERSED AND RENDERED IN PART; AFFIRMED IN PART.

. The record is not clear as to the age of this child other than to suggest it was a child of tender age.

. This testimony is contradicted by his prior deposition testimony, but the conflicts do not affect the disposition of the issues before this court.

. The initial suit named Illinois Insurance Exchange as Fitch’s insurer, but the suit was later amended to delete that defendant and replace it with Geneva Assurance.